No. 36,331

BRITA E. WHITE, *Appellant*, v. CHRISTIE W. WHITE, *Appellee*.

(159 P. 2d 461)

Opinion filed June 9, 1945.

*Harvey C. Osborne*, of Wichita, argued the cause, and *Chas. G. Yankey, John G. Sears, Jr.*, and *Verne M. Laing*, all of Wichita, were on the briefs for the appellant.

*Clarence R. Sowers*, of Wichita, was on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was a proceeding in habeas corpus in Sedgwick county instituted by a mother to obtain custody of her two minor children. The defendant, father of the children, prevailed and she appeals.

In an action in California brought by the husband Brita E. White and Christie W. White were divorced on March 26, 1937. They had two daughters, one about four years old and the other two and a half. Custody of the children was awarded to the father "with right of reasonable visitation given to the mother." In September, 1937, about six months after the divorce was granted, the mother sought, in the California court, to have the order modified to give her specific week-ends to visit the children and to have them with her. She alleged that the father had refused her the right of reasonable visitation and made other allegations which need not be noted here. Order was issued to the father to show cause why the provisions as to custody should not be modified and he was directed in the order not to take the children out of Los Angeles county. On June 11, 1938, the mother sought further modification as to custody, and an order was made fixing certain hours and days when she should have the children. On June 21, 1939, she again filed an application for further modification. A court assistant was directed to make an investigation and recommendation. She did so, and made a recommendation that the custody provisions be modified and the mother permitted to visit the children at all reasonable times, and that she have them every other week-end from Saturday morning until Sunday evening and also have them for half of the Christmas and Easter vacations and one month during the summer vacation. The recommendation was approved by the court and an appropriate order entered. The order also provided that "these children shall not be taken out of southern California." About two years later, in August, 1941, the mother again sought modification of custody, alleging among other things:

"Plaintiff has since remarried and is now separated and divorced from his second wife. That children have been moved from home to home by the plaintiff and that plaintiff has not the proper home or environment for said children. That plaintiff has given the custody of the children to the defendant and informed the defendant that he desired that defendant rent a

large enough home for children and that defendant has done so. Defendant believes that she can give the children a proper home environment, care and education."

Again the case was placed in the hands of the court's official investigator. After investigation she filed a written report, shown in the record here, in which she recommended that the custody of the children be changed from the father to the mother. At the hearing upon this report the father appeared by his attorney and certain additional testimony was received. The court approved the recommendation, entered an order changing custody to the mother, and again directed that the children should not be taken out of southern California. The father was ordered to return the children by five o'clock that evening, September 2, 1941. He did not return the children as ordered. It subsequently developed that he had left with the children the day before, leaving no information as to where he was going.

The record discloses that for three years the mother sought to learn the whereabouts of the children or the father. At the hearing in the instant action she testified that for those three years she had "followed every clue and turned it over to every agency in California, even the F. B. I." Finally, she learned that the children were in Wichita, Kan. She came to Wichita early in September, 1944, and immediately instituted habeas corpus proceedings.

In view of the nature of the case and of our conclusion, presently to be stated, it is well to set out rather fully what transpired at the hearing in the district court with considerable recital of the testimony.

At the opening of the hearing counsel sought to put into the record allegations contained in the petition in the divorce action in California in 1937. The court properly held that it could not go into the merits of the divorce case. However, appellant was asked concerning the alleged improper conduct involved in that action and she answered that that was in 1936, that the man involved had married, that he has a boy six years old, and that she had not seen him for at least four or five years. No attempt was made to show any other improper conduct or to establish any other grounds for a finding that she was not a fit and proper person to have the custody of the children. All the evidence received was to the contrary. Appellant testified that she was thirty-four years old, that she was living with her parents in California, that her father is an

executive for Safeway Stores receiving a salary of around $275 a month. She further testified:

"The house they live in is a six-room stucco house, a very modern home; they own this home. I work for the Richfield Oil Corporation; my base salary is $140 per month and I receive time and a half for overtime. My average check at the present time is approximately $80 semimonthly. This is the net amount and does not include deductions made for taxes, social security, etc., nor deduction for savings bond each month. I receive net a little over $160 per month. My parents are members of the St. Michael's Episcopal Mission in Los Angeles. My father is senior warden and on the Bishop's Committee. . . . I was reared in the Episcopal Church. I attend the Espiscopal Church and haven't missed a Sunday since the girls left. . . . My plans relative to caring for these children are that I have rented a house. It is being painted and papered. It is a six-room house and I have all the hopes in the world of giving the girls everything that is in my power to give them—music lessons and everything. In addition to that I could stay with my folks, that is, if it is a necessity, but it is not. I think it is better that I have a house of my own. On the salary that I am earning I feel that I am in a position to care for them. It is my plan that I have some lady to live with me to help in supervising and caring for the house and helping care for the children. I get off work at four-thirty so I will have all evening with them. I could cook their meals and take care of them myself and I am off a half day on Saturday. The lady that I had in mind is about forty-five years old. She is a widow and she is a friend of my mother's. She goes to my mother's church. She has reared children and has married children. If for any reason these arrangements should be interrupted I could live with my mother and she could always come over and care for them in the few hours I wasn't there. There is no one living in my mother's and father's home other than they. They are both sixty-one years old and are in good health.

. . . . . . . . . . . . . . . . .

"This house is close to the school, two and a half blocks from the elementary school. I have leased it for a year. I signed the lease on August 19, I believe it was, and I leased it for the purpose of a home for the girls.

"Q. But I thought you stated you didn't know whether you could even find them. A. There has always been a hope in my heart that I would find them, sir.

"I have furnished the house, but I have not been living in it. I have lived for the past six months at 102 North Alexandria, Los Angeles. I live with a Miss Gladys Porter. She works for Grubb and Tweedy, accountants in Compton. I am staying with my parents temporarily while the house is being redecorated. They sold the house on Alexandria street so I had to move."

Appellee testified that on August 25 or 26, 1941, he decided to change his domicile to Wichita; that he knew that the hearing was set for September 2; that on September 1 he started for Kansas with the children and that he didn't tell their mother where he was going, and that in the years that followed he never notified her where he

was. He testified as to the care he had given the children; that he had tried to give them every advantage; that they appeared to be happy and had never asked to see their mother; that their mother used to have a quick temper, but he didn't know whether she had overcome that; that as far as he knew she always got along all right with the children; that at one time he had turned the children over to their mother for a number of weeks. This was after his remarriage and subsequent separation from his second wife, when he had no suitable way to care for them.

Several witnesses testified as to appellee's good reputation in Wichita. Mrs. Hansen, in whose care appellee had placed the children, testified concerning them and the care they received, and as to appellee's apparent affection for them. No question is raised as to the good care the children had been receiving. Mrs. Hansen also testified that appellee had provided everything needed for them.

On cross-examination Mrs. Hansen testified that she had the children for a year, and that then her husband had a heart attack and another place had to be found for them temporarily, and that the father put them in the Wichita Children's Home.

At the close of the hearing, in announcing its decision, the trial court commented at some length upon the unfortunate situation and the difficulty of deciding such an issue between a father and a mother, both of whom seemed devoted to their children. Referring to the grounds upon which the divorce had been granted to the husband in 1937, the court observed that early waywardness may be abandoned and that nothing had been shown against the mother's character during the years that had passed. Other comment by the trial court also has a bearing upon the issue presented here. Following are extracts from the trial court's statement announcing a decision to award custody of the children to the mother:

"I find nothing in the testimony against this father. Indeed, it is fine. I find nothing against this woman since the father has come to Kansas—since those orders of the judge were made. Except this one thing—the father's attorneys, of course, knew what was going on, or should have known, and his picking the children up and coming away before the court could act on those motions, on the face of it looks bad, although he may have had no guilty purpose in mind. I am not accusing him of that. . . .

"Now, so far as the evidence before this court is concerned, they are both good people. Then what shall I do with these children? Here is the prospect the father has of a second marriage and that is honorable. There is nothing wrong about it whatever, but, of course, the children would be under a stepmother. *A stepmother's interest in children, no matter how good she may be,*

*is not as good as the real mother, ordinarily.* . . . So strong is mother's love that we often speak of it as being the strongest bond there is on earth. I have used many expressions in this court. I have said that father love is greater than mother love. Now, here, this father illustrates that point. He has risen above all his personal feelings and devoted his time and his money to the taking care of the children but, after all, that doesn't reach the tenderness of a real mother's love. And there is the thing right there. I am just inclined to think—I have watched these children closely in court to see what their facial expressions would be as you have proceeded with your testimony and with your arguments. I have come to the conclusion, however, that the best interests of the children is with the mother and that is the sole thing that I am to pass on. So it is the order of the court that the writ be allowed and the children turned to their mother.

. . . . . . . . . . . . .

"Mr. Sowers: Would the Court care to speak to the children to find out what their wishes might be?

"The Court: I think I know their wishes without talking to them. If you had been looking at the children after I made that remark, you would have gotten a reply to the question."

After the decision had been announced counsel for appellee asked for a continuance in order to make further investigation in California as to whether the mother was a fit and proper person to have custody of the children. The court stated that that would be contrary to the rules, as the case had been finished, both sides having rested. However, after considerable colloquy continuance was granted over appellant's objection. Prior to the granting of continuance Mrs. Hansen was again put upon the stand and testified that if given the custody of the children during the continuance she would not allow anyone to take the children from her sight; that she did not believe the father would take the children, and that she would not aid him in any way. She further testified:

"Q. But you feel, don't you, Mrs. Hansen, that these children should be with this mother? A. Well, I hate to see them go back to Los Angeles where this affair has all been. If she was living here—

"Q. You have these children at heart—of course, one of the reasons is you have learned to like the children, like I would or anybody else would? A. That is true.

"Q. But you still feel that these children, after seeing them for several years, that the children should be with this mother? A. I think they should be under a mother's care. I really do. I don't know Mrs. White. I don't know if she is the proper mother. That is why I have them.

"Q. I was going to say that undoubtedly you have been favorably impressed but you haven't been impressed unfavorably during the short time she has been here? A. No. I haven't."

During the continuance appellee made a trip to California. When the hearing was resumed on October 12 there was some conflicting testimony as to whether the house which the appellant had rented in California was in good condition or was in a desirable neighborhood, but no testimony was offered reflecting in any way upon the character of the mother as a fit and proper person to have custody of her two daughters. Mrs. Hansen's daughter was put upon the stand and testified that she and Mr. White expected to be married in June; that she had lived in Los Angeles and was familiar with the house and the neighborhood where the children would be taken if given to the mother and that they were undesirable. With no purpose of discrediting her or of questioning her purpose to give good care to the children, we quote parts of her testimony which help to give a picture of the whole situation. She testified:

"Q. If I understand you correctly in your diagnosis of the trouble with the children, it is due to the—that their trouble is largely due to the frequent change. Am I correct in that? A. Yes. Interruption in their home life.

"Q. Now you have further given quite a lengthy testimony of the care that your mother has given these children, which I firmly believe. Isn't that true? A. Yes.

"Q. Now, in June of this year, you propose if these children are awarded to Mr. White, to create another interruption, don't you? A. This woman knew where these children were in June. She could have come out here before school started.

"Q. That will be another interruption? That will be another change, will it not? A. No. It will not.

"Q. Why not? A. To a certain extent, these children are used to me. These children mind me just as if I was their mother, you might say.

"Q. But you intend to establish another home, do you not? A. Why, of course. They are looking forward to it.

"Q. Separate and apart from your Mother? A. Yes.

"Q. Your mother will not have any longer the care of them? Is that right? They will be in your custody and care? A. They will be my children.

"Q. Now, isn't it true that your mother takes care of someone else other than children? A. She has. Yes.

"Q. Isn't it true that she is now? A. Yes.

"Q. And has been for some period of time? A. My mother has had somebody in her home taking care of them. She had my girl friend. She has always had somebody to take care of outside of someone in her own family.

"Q. Isn't it true that I have observed here—maybe I am wrong,—that in order for you to hear distinctly, a person almost has to be right in front of you? A. No. As long as you are on this side of me, left. If you happen to be on my deaf side, I don't hear you.

"Q. What was the cause of your defect in your hearing? A. An auditory nerve upset; that is, trouble in the inner ear.

"Q. Now is there something wrong with your vision also? A. Yes.

"Q. How long has that been in existence? A. Well, if you turn your back to me I can't hear you in a big room like this.

"Q. How long has that been in existence? A. I have been blind in one eye since I was three years old.

"Q. Have you been married before? A. Yes.

"Q. How long ago was that? Were you divorced? A. Yes.

"Q. How long ago was that granted? A. 1934."

Following this testimony counsel asked that the court talk to the children. Thereupon the court and the two girls withdrew into the court's chambers where the children were interviewed by the court, neither the parties nor counsel being present. When they returned to the courtroom the following transpired:

"The Court: Perhaps it is the best way on earth where parents of children can not get along together, to leave their disposition with the Court, acting seriously and honestly. Of course, I understand. I have reared children of my own and both were girls, my children. It will stab this father and this mother to death for me to tear the children away from either one of them, but, you see—but, you see, if a man out here in an accident gets his leg broken, they take him to the hospital. The poor doctor up there is just what I am here. He can't help the broken leg. I can't help the broken home. The doctor can only go ahead and treat the patient as best he can and that is all I can do with you but my paramount interest is what appears to me to be the best situation and condition for these children, the possibility in the future. According to your suggestions, I have talked to the two children and when I get through with this matter, I don't want either of you to ask the children anything. There is no use in spoiling their happiness, no use in chastising them because they expressed their honest opinion to me, where they would rather be.

"Of course, I understand too, the children are young and often they will choose the wrong thing so far as their expression and desire is concerned, but I am taking in consideration the fact that Mr. White is a good money-maker and has the future before him with the children. These two ladies sitting back there—the mother and daughter—seem to be estimable women and so far as the mother of these children is concerned, perhaps, since her day of repentance, she has lived a good life. Let us hope so, anyway, and will continue to live a good life, but, after all, the prospect is not as bright for her to rear these children as it is for their father.

"And, after talking with the children, I am now firmly of the opinion that I must leave the children with their father under the present arrangements and the future arrangements which he has in prospect. That seems to be the best disposition, as I look at it, for the welfare of the children, and so I give the children to the father.

"Now, Mother, you may see these children at vacation times if you want to come here to see them. I wouldn't want the children running back and forth

this great distance and make more trouble for the Court. You see how hard it has been for you to get a hearing before me. I am a busy man. Although this present election may remove me and put a new man on here, I can't even think of that. I must proceed as if in the future you will come back here to me.

"These children will not be unhappy with their father and this young lady back there, his intended wife. From their own expression, this situation looks better to them than the one out there does and I must be largely guided by that, with my best judgment in the matter. I wish you both well. Both of you do in the future the best you can to live honorable, upright lives. The father may take the children.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Mr. Osborne:  .  .  . If there is going to be testimony upon which the decision is based, I believe that should be in the record.

"The Court: I will put the substance of it in the record. The older little girl, take the witness stand. But, now, here, in the future, I don't want the father to say anything to the children. Don't question the children. And I don't want the mother to question the children at all what they told me in here. (Indicating the Court's chambers.)

"The Court: Very well, little girl. I won't swear her. I will just take her statement.

"DIANA WHITE takes the witness stand.

"Mr. Sowers: As I understand, your decision in this matter is not based upon what the children said.

"The Court: O, no. I just learned their desire, but if he wants a record, let him have one. Now, my little girl, in my private room, to me, at the request of counsel, I asked you where you would rather live, here or in California. What was your answer, please? A. I said that I would rather live in both places.

"The Court: And I told you you couldn't live both places. Answer it out loud. A. Yes.

"The Court: Then what did you say? (No answer.)

"The Court: And then what did you say? A. Wichita.

"The Court: Very well. Now, you heard the other little girl make a decision. What did she say? A. The same.

"The Court: Wichita? (No further answer.)"

"*Examination of Diana White by Mr. Osborne.*

"Q. What did you say your name is? A. Diana White.

"Q. Where do you go to school? A. Martinson School.

"Q. How long have you been going to school there? A. Two years.

"Q. You used to live in California? A. Yes.

"Q. Do you remember when your mama came out here? A. Where?

"Q. Out here to Wichita? A. Yes.

"Q. You like your mama, don't you? A. Yes.

"Q. And as a matter of fact, you would like to be with your mama, wouldn't you? A. Yes.

"Q. And when you came to Wichita where did you stay first? Do you remember? A. My Uncle Roy's.

"Q. How long did you stay there? A. I don't know exactly.

"Q. Did you stay any other places, too? A. Yes. A lady across the street from my Uncle Roy's.

"Q. And you stayed there some period of time? A. Yes.

"The Court: I don't think that is material now. We are just killing time. I have my appointments I have to keep.

"Mr. Osborne: Of course, whatever is the will of your Honor. I would like to see whether there is anything as far as—to found the decision on. It doesn't appear to me to be.

"The Court: No. They just merely expressed a desire. That's all.

"Q. You think your mother would take nice treatment of you, don't you?

"The Court: I wouldn't want her to go on record here. She spoke very well of her mother. Both of them did—spoke very well of their father and of their mother. That is the end."

Motion for a new trial was made. In the meantime the mother had gone back to her work in California. At the hearing upon the motion a number of affidavits and letters were received, which had been properly noticed to appellee and which were received without objection. It would unduly extend this opinion to quote these documents in full. It appears that upon her arrival in California the mother had written at some length concerning her trip. The letter is full of expressions of mother love. It is not denied that the letter was returned by the appellee without having been shown to the girls. In returning the letter the appellee wrote to appellant as follows:

"WICHITA, Ks., Oct. 21, 1944

"Bri

"You will find in closed your letter written to the girls, I am returning it to you, and advising you not to write to them any more, as they are not to receive any mail of any kind from you, or presents of any kind.

"You know that they are getting the best of care and they are going to continue to get it.

"Please do not interrupt them anymore. Diana received the poorest grades the first six weeks of school this year, that she has had for the past three terms, just due to the interruption that was caused here the first six weeks, by your court appearance.

CHRIS."

It further appears from the affidavits, received without objection and with no denial made as to their content, that before she left Wichita the appellant had bought and given to each of the girls a coupon book good for purchase of ten dollars in merchandise in a department store in Wichita. Soon after she got back to California appellee's fiancee returned the coupon books to appellant's mother, Mrs. Gilbert, with the following letter:

"October 14, 44.

"DEAR MRS. GILBERT:

"Please see that your daughter 'B' receives these two gift certificates. Had I known that she gave them to Mother I would have given them back at the time. I am quite sincere when I tell you that Wanda and Diana will receive no gifts of any kind from her. They are looking forward to a happy home life, which they cannot have with reminders of the past. Don't mistake me—they'll never forget her and with her annual visits back here I am sure that we can all live happily ever after. Do help your daughter to understand."

In approaching the issues presented by this appeal we must first note the fact that when the instant action was brought legal custody of the children was in the mother. The validity of the order of the California court in September, 1941, awarding custody to her is not questioned. In violation of the order of the California court the father had brought the children to Kansas. The fitness of the mother, at the time of the decree, had been established and the burden was upon the father to show that legal custody should be taken from her and given to him. (*Martin v. Martin,* (Tex. Civ. App.) 132 S. W. 2d 426; *Wood v. Wood,* 220 Iowa 441, 262 N. W. 733; *Elsman v. Elsman,* 54 Nev. 20, 2 P. 2d 139, *In Re Wood,* 103 Cal. App. 790, 285 Pac. 323; *Vickers v. Faubion,* (Tex. Civ. App.) 224 S. W. 803; 27 C. J. S. 1183; 17 Am. Jur. 519-521.)

What force and effect should be given to the California order awarding custody to the mother? The rule is well established that an order awarding custody of minors is not *res judicata* in the sense generally applicable to judgments. (*Janney v. Janney,* 159 Kan. 230, 154 P. 2d 131, and cases cited page 232.) This is true whether the prior order awarding custody was entered in the state where a subsequent action to secure custody is brought or was entered in another state. The fact that custody has been awarded in an action in another state does not prevent inquiry into the question in a proper action by a court subsequently acquiring jurisdiction of the parties. The full faith and credit clause of the federal constitution does not prevent such inquiry. (*In re Bort,* 25 Kan. 308; 72 A. L. R. 441 *et seq.;* 116 A. L. R. 1299 *et seq.; Yarborough v. Yarborough,* 290 U. S. 202, 54 S. Ct. 181, 189, note 19.) But this is not to say that a prior and valid order as to custody of minors is not in full force and effect until lawfully modified or superseded in a subsequent action.

This question as to the effect to be given to a prior adjudication

as to custody of minors was considered and discussed at some length by this court in the case of *Wear v. Wear,* 130 Kan. 205, 285 Pac. 606. Cases from many jurisdictions were reviewed, illustrating some conflict of authority on the question. In the Wear case custody had been awarded to the mother by an Oklahoma court in a divorce action in which the father had appeared and defended. Leaving his wife and child in Oklahoma the father had taken his belongings and come to Kansas for the purpose of establishing a domicile here. After he had come to Kansas the wife sent the child to visit relatives with whom the father was staying. The child was still in Kansas when the divorce action was tried in Oklahoma and when custody was awarded to the mother. Delivery of the child being refused, the mother came to Kansas and instituted habeas corpus proceedings to secure its custody. The husband, relying principally upon a contention as to jurisdiction, offered no evidence that the mother was not a proper person to have the child or that there had been any change of conditions subsequent to the time of the decree in Oklahoma.

With supporting quotations from numerous authorities which need not be repeated here this court said, among other things:

"The trial court correctly held that the contest as presented to the court was one between the father and the mother, and that as between them the matters adjudicated by the Oklahoma court in the divorce case were *res judicata* as to matters determined by the decree in that case, and as of the time it was rendered. The trial court specifically offered to hear evidence as to changed conditions which would authorize or justify a different order with respect to the custody of the child, but, as shown by the entry in the journal, counsel for respondents stated in open court they had no evidence of that character to offer. From this it follows that the court made the only disposition of the child justified under the record, and the judgment of the court below is affirmed." (p. 225.)

Earlier in the opinion it was stated that while the former adjudication as to custody might be binding "as between the parents themselves" it was "evidentiary only and not controlling" as against the state, in its relation of *parens patriae,* in considering the welfare of the child. The comment that the former adjudication was evidentiary only is not out of harmony with the statement from the opinion above quoted. A former adjudication is evidentiary as to the facts and situation then found to exist but it is not necessarily controlling in determining custody at some later time.

*Wear v. Wear,* supra, was followed in *Kruse v. Kruse,* 150 Kan. 946, 96 P. 2d 849, with further citation of authorities. In the

opinion the rule as stated in 2 Beale, Conflict of Laws, § 147.1, was quoted as follows:

"When the custody of a child has been. awarded to one parent by a court having jurisdiction so to do, the right of this parent will be recognized by other states.

"The facts upon which the award was based have become *res judicata,* and cannot be reëxamined in the second state. But this estoppel extends only to conditions which existed at the time of the original decree; the second court may examine any facts which have occurred since the original decree which throw light upon the fitness of the parents to have custody of the child."

In Restatement, Conflict of Laws, § 148, it is said with reference to change of custody by a foreign state:

"In any state into which the child comes, upon proof that the custodian of the child is unfit to have control of the child, the child may be taken from him and given while in the state to another person."

To hold that a prior adjudication awarding custody of a minor child may be treated as a nullity, and be given no consideration whatever would produce intolerable situations. This would be true regardless of whether the prior adjudication was by a court of the same state or by a court of a foreign state. To permit a parent, defeated in a contest for custody of a child, to avoid entirely the effect of the decision against him simply by spiriting the child away into another jurisdiction would make a mockery of judicial decrees.

Having examined this record with greatest care, having in mind the principles heretofore stated, we are impelled to the conclusion that the trial court was not justified in taking legal custody of these two young girls away from the mother and giving it to the father.

Let us summarize the salient features of the situation presented to the trial court, under the evidence. After investigation by an officer of the court, the California court awarded the custody to the mother. Implicit in that order was a finding that she was a fit and proper person to have such custody. The court was familiar with the old charges made in the divorce action a number of years prior thereto. In successive orders in the intervening years, and after official investigations, the mother's rights of visitation had been extended and the periods when she might have the children with her had been lengthened. Even apart from adjudication of the question by the court the father was in no position to contend that she was not a proper person to have their custody when the California court awarded it to her in 1941. Following his remarriage

after the divorce from appellant in 1937, and his subsequent divorce from his second wife, he had voluntarily placed the children in appellant's custody for many weeks. In violation of the order of the California court appellee surreptitiously took the children away and came to Kansas with them. He left no information as to where they had gone and for three years he managed to keep their whereabouts unknown to the mother. For three years she conducted a persistent search for them, even engaging the services of the F. B. I. for that purpose. When she finally located them she came to Wichita and instituted this action in habeas corpus. Aside from an attempt to inject the charges made in the old divorce action in the California court which later awarded the custody to her, no evidence of any sort was offered to show that she was not a fit and proper person to have custody of her daughters. After hearing the evidence the court said: "I find nothing against this woman since the father has come to Kansas—since these orders of the judge were made." Again, the court said: "Now, so far as the evidence before this court is concerned, they are both good people." And after further comment, pertinent portions of which are hereinbefore quoted, he announced that the writ would be allowed and custody awarded to the mother. Upon inquiry by counsel for the father as to whether the court would care to talk to the children to find out their wishes, the court said: "I think I know their wishes without talking to them. If you had been looking at the children after I made that remark you would have gotten a reply to the question."

Then followed a quite unusual proceeding. Counsel for the father suggested that a continuance be granted "to give us an opportunity *to conduct our own investigation and produce our testimony as to whether or not she is a fit and proper person* before you just take the children right out of the jurisdiction of the court where we are forever barred." (Italics supplied)

The continuance was granted and the father made a trip to California. After he returned the case was reopened but not one word of testimony or other evidence was produced reflecting in any way upon the character of the mother. Such evidence as was received was in her favor. Mrs. Hansen, who had been taking care of the children and who was a witness for the father, said that while she didn't know the appellant her impression of her during the time she had been in Wichita had not been unfavorable.

When all testimony was in, upon the reopened hearing, counsel for appellee again renewed the suggestion that the court talk to the children. What then happened has been shown by the recital earlier in this opinion. It will be noted that the question asked of the older girl when she was put upon the stand was whether she would rather live in Wichita or California, to which she replied "in both places." The difficult situation in which the child was placed is obvious and touches the sympathies. What conversation took place in the Judge's chambers we do not know. At any rate the court, when reversing its former decision, stated that its new decision to award the custody to the father was not based upon what the children had said. The only considerations which the court mentioned were that "Mr. White is a good money-maker and has his future before him with these children" and that appellee's fiancee and her mother appeared to be estimable women, and that he had in view the existing arrangements and the "future arrangements"— referring evidently to appellee's approaching marriage. In the first place, we find no evidence whatever as to appellee's financial condition or as to the salary or wages he was receiving. The only testimony was that he had been a dependable employee of the Santa Fe Trails Company for something over a year. In the second place the general rule is that financial status is not alone sufficient to justify award of custody of minors. (27 C. J. S. 1176 and cases cited.) Furthermore, the undisputed testimony was that appellant had employment with a substantial company in California and was receiving something over $160 a month after deductions for taxes, social security, etc. Other pertinent testimony as to her situation need not be reviewed. It indicated beyond question her ability to take care of the children.

To what has been recited must be added brief reference to evidence submitted upon the motion for a new trial, set forth in the prior recital herein, and before the trial court when the final decision was made. It was shown that upon her return to her job in California, pending final disposition of the case, appellant had written a letter to her daughters. We will not lengthen this opinion by quoting the letter in full. It was a good letter. There was in it no word of reflection upon appellee or upon anyone else. It was simply what might be expected from any devoted mother to her young daughters. And yet without showing it to the children appellee returned it to appellant with the curt comment:

"I am returning it to you, and advising you not to write them any more, as they are not to receive any mail of any kind from you, or presents of any kind."

This was not all. The ten-dollar merchandise coupon books which appellant had left to be given to her daughters were not delivered to them but were returned by appellee's fiancee to appellant's mother with this declaration: "I am quite sincere when I tell you that Wanda and Diana will receive no gifts of any kind from her. . . . Also, any of their old toys, etc., sent here will be sent on to war relief." Comment is unnecessary.

As the trial court truly stated, a case of this sort always presents a most distressing problem. The tragedy of broken homes ever lays its hand most heavily upon the innocent children. The trial court found nothing against either the father or the mother. There is nothing in this record to gainsay the father's affection for his daughters or his purpose to give them every care a father can give. Nor do we question the purpose of appellee's fiancee to care for them properly in case the marriage with appellee be consummated. But the fact remains that appellant, and not she, is the mother of these young girls. There is no substitute for a mother's love. Nor for young girls is there any substitute for a mother's care.

We intend no reflection upon the intentions of the trial court. And we, too, are distressed by the necessity of deciding an issue so laden with intangible but deep, human, personal values. But while the decision is not pleasant to make, we have no hesitancy, upon the record before us. Custody had been lawfully awarded to the mother. We find nothing in this record by way of changed conditions or otherwise to justify taking that custody away from her.

The judgment is reversed with directions to allow the writ, and it is the further order of the court that the mandate go down at once.