**GERALDINE HODGE, Plaintiff**

**v.**

**OSBORNE ANTONIO HODGE, Defendant**

Civil No. 1976/686

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 8, 1977

ARNOLD M. SELKE, ESQ., St. Thomas, V.I., *for plaintiff*

JOHN L. MADURO, ESQ., St. Thomas, V.I., *for defendant*

FEUERZEIG, *Judge*, Sitting by Designation

### MEMORANDUM OPINION

Divorce proceedings by their very nature are filled with tension, anxiety and often with acrimony. When the proceedings are further complicated by a dispute over who shall have custody of the children of the parties, the matter becomes even more painful. This case is no exception. Here, the Court is witnessing the termination of a sixteen-year marriage that produced five children. Although both

parties are before me seeking a divorce, the central issue in this case is which parent should be awarded custody of the children.[1] In making that determination, it is necessary for me to consider the viability in this jurisdiction of the judicially created "tender years" doctrine. Also at issue are the extent to which one party's misconduct should affect the award of child custody, and the weight this court should give the preference of the children.

Osborne Antonio Hodge married Geraldine on June 18, 1960, in New York. On December 31, 1961, their first child, Evelina, was born. Almost one year later, on December 22, 1962, Deborah was born, followed by Antonio, Jr. on March 10, 1965, Gerald on February 20, 1966, and Barbara on May 19, 1967. The parties resided in New York City for several years. Approximately six years ago they moved to St. Thomas, where Mr. Hodge had been born and raised. Both parties became police officers with the Virgin Islands Department of Public Safety.

On September 30, 1976, Geraldine Hodge filed a sworn Complaint seeking dissolution of the marriage, custody of the five children, child support, alimony, distribution of the marital property, and reasonable attorney's fees. She also moved for relief pendente lite pursuant to 16 V.I.C. § 108. A hearing on the motion was held on October 6, 1976, before Judge Cyril Michael. As a result, Mrs. Hodge was permitted to occupy the marital home with the children. Mr. Hodge on December 20, 1976, filed an Answer and Counterclaim, alleging that the Plaintiff was an unfit mother and praying that he be granted a divorce, custody of the children, and an equitable distribution of the property. Mrs. Hodge replied on January 19, 1977, with a general denial. The Court heard testimony on the merits for three full days on February 2, 16 and 18, 1977.

---

[1] Although five children are involved, both parties agree either parent should be awarded custody of all five children, and that the siblings should not be separated.

## ENTITLEMENT TO A DIVORCE DECREE

There can be no doubt that the granting of a decree of divorce to both parties is warranted. The Court must, however, make an independent determination as to whether the evidence satisfies the statutory standard of 16 V.I.C. § 104, which provides:

A decree granting a legal separation or dissolving a marriage may be entered when the court is satisfied from the evidence presented that there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved.

■ The testimony of Mr. and Mrs. Hodge portrayed a progressive decay in the marital relationship that began around the time the parties moved to St. Thomas. Mrs. Hodge, in fact, objected to moving to St. Thomas from New York City, and once in the Caribbean, she was unhappy with the family's initial living quarters on St. Thomas and complained of suffering from headaches for a year as a result of the heat. Mr. Hodge first observed changes in the marriage in 1972, but the difficulties were tolerable. In May of 1974, Mrs. Hodge visited Puerto Rico for five days without Mr. Hodge's consent, and it was during 1974 that Mrs. Hodge began to spend time with another man, initially on an innocent basis. However, this extra-marital relationship continued to develop and as it did, her emotional attachment to her husband declined.

The complete breakdown of the marriage, though, followed an August 19, 1976, phone call to Mr. Hodge from a friend in Miami, Fla. who said he had just seen Mrs. Hodge in Miami with another man. Mr. Hodge was dumbfounded because Mrs. Hodge had told him she was going to visit her mother in New Jersey. Domestic peace came to an end, and Mrs. Hodge left the home on September 19, 1976. Although apparently she was in St. Thomas, the

567

Defendant did not know her whereabouts until after the October 6, 1976, hearing before Judge Michael. At that time, Mr. Hodge agreed to let his wife reside in the marital home with their children.[2] Many other incidents occurred. For example, Mr. Hodge admits that on or about September 26, 1976, he hit Mrs. Hodge in front of their children, and testified that on or about December 6, 1976, Mrs. Hodge was seen by Mr. Hodge emerging from a hotel room at Sapphire Beach shortly after her man friend had left the same room. The evidence, in sum, is more than sufficient to establish an irreconcilable breakdown of the marriage relationship.

### FACTORS RELEVANT TO AWARD OF CHILD CUSTODY

■■ Each party insists upon having custody of the five children. While the parents' desires are a factor to be considered, the paramount concerns in making an award of custody are the best interests and welfare of the children. 16 V.I.C. § 109(1). Consequently, the rights of the parents are subordinated to the children's interests. Boone v. Boone, 80 U.S.App.D.C. 152, 150 F.2d 153 (1945). Neither parent has a claim superior to the other. Adams v. Adams, 206 Ga. 881, 59 S.E.2d 366 (1950); Oxley v. Oxley, 81 U.S.App.D.C. 346, 159 F.2d 10 (1946). The Court, as the trial court, has broad discretion in awarding custody. Miezio v. Miezio, 6 Ill.App.2d 469, 129 N.E.2d 20 (1955). To aid the parties in understanding the rationale of this Court's decision, I am setting forth the relevant factors and the findings of the Court pertaining to each.

---

[2] Plaintiff argued that Judge Michael had ordered the Defendant to remove himself from the premises and granted custody pendente lite to her. A written order to this effect was submitted for Judge Michael's signature after the October 6 hearing, but it was never signed. In any event, Mr. Hodge testified that he voluntarily agreed to move and to permit Mrs. Hodge to have temporary custody of the parties' five children. The pleadings substantiate this. See Defendant's Answer and Counterclaim, § 9, and Plaintiff's Reply, § 2.

■ *The "tender years" presumption.* Historically, courts have presumed that the welfare of children of "tender years" is best served by placing them in their mother's custody if she is not unfit and other things are equal. This judicially created principle is not inflexible and gives way where it is not in fact in the children's best interests. Sellman v. Sellman, 236 Md. 1, 202 A.2d 372 (1965); Vanden Heuvel v. Vanden Heuvel, 254 Iowa 1391, 121 N.W.2d 216 (1963); Sartin v. Sartin, 349 S.W.2d 705 (Ct.App.Mo. 1961). As the Sartin court explained:

If she is able to give her undivided attention to their care, while the husband would be forced to leave them with relatives for considerable periods of time because of his business affairs, then custody must naturally be left with the mother. 349 S.W.2d at 711.

■ The presumption is based upon the traditional parental role of the wife as the homemaker, the one who performs household duties and devotes herself to the children and their welfare, while the husband devotes his energies to earning income to support the wife and children. The presumption assumes that children of tender years more properly belong with their mother because she can more adequately fulfill what might be considered the mother's role, i.e., providing the physical, emotional and psychological nurturing that a working father is not able to provide. When the evidence is to the contrary, the presumption must fail. Forsyth v. Forsyth, 172 N.W.2d 111, 114 (Iowa 1969). The Supreme Court of Iowa recently abandoned the presumption. It noted that "the real issue is not the sex of the parent but which parent will do better in raising the children." In Re Marriage of Bowen, 219 N.W.2d 683, 688 (Iowa 1974). In fact, the trend is to disregard the presumption and consider the evidence without placing either party under a special burden. See Davis v. Davis, 3 Family Law Reporter 2028 (Ill.Ct. App. 4th Dist., decided September 19, 1976); Strand v. Strand, 2

Family Law Reporter 2839 (Ill.Ct.App.2d Dist., decided September 1, 1976); State ex rel. Watts v. Watts, 350 N.Y.S.2d 285 (N.Y.C. Fam.Ct. 1973) (preference held unconstitutional as violative of equal protection of the laws); Lane v. Lane, 40 Ill.App.3d 229, 352 N.E.2d 19 (Ill.Ct.App. 3rd Dist., 1976) (presumption that child's custody be granted to mother unless she is shown to be unfit cannot be harmonized with state constitutional provision that equal protection of the law shall not be denied or abridged because of sex, 1970 Ill. Cons. Art. 1 § 18).

■ This jurisdiction follows the common law where local statutory law and the legal restatements of the American Law Institute are silent. 1 V.I.C. § 4. Such is the case here. In view of the judicial trend away from application of the doctrine, this Court has serious doubts as to the viability of the tender years presumption. However, this Court need not accept or reject the presumption at this time. Even if applicable, it should not be applied where the rationale for its existence is not apparent. Moreover, the presumption will not be given more weight than the preponderance of the evidence if that evidence indicates that the children's welfare lies elsewhere.

■ Clearly, the facts in this case dictate that the presumption should not be applied. Both parties work full time as police officers, and often work irregular shifts that have precluded each from giving their offspring the attention they require and deserve. When working nights, Mr. Hodge said he often would stop at home to check on the children. This testimony was not contradicted. Moreover, I found Mr. Hodge to be a thoroughly credible and frank witness. His partner, Officer Kenneth Blake, confirmed Mr. Hodge's testimony and stated that when they both worked nights, Mr. Hodge often stopped by the home. Although I find that Mr. Hodge did not make this an invariable routine, I do find that several times each week he made an

effort to check on his children's welfare during his working hours. In addition, since the mother has had sole custody of the children, Mr. Hodge has seen his children almost every day. Also, based upon the testimony of Mrs. Hodge, Mr. Hodge, his mother, Mrs. Inez Hodge, and of the five children, I find Mr. Hodge often used to cook for the children, and when he did not cook for the children, their grandmother frequently prepared their meals.

Subsequent to the October 6, 1976, hearing before Judge Michael, Mrs. Hodge had ample opportunity to establish her ability to meet her children's various needs and to demonstrate the presence of the assumptions underlying the tender years doctrine. In this Court's opinion, she has not done so. By her own admission, she absented herself from the family home on a number of evenings without making provision for · proper adult supervision of her children. This is so even though I find that she recently has been spending most of her off-duty time at home.

The Defendant offered testimony of four members of the Department of Public Safety to establish that Mrs. Hodge had not been responsible to the children's needs subsequent to October 6, 1976. Sgt. Cordell R. Rhymer, the dispatch officer, testified that on two occasions he had received calls from the Hodge children saying that their mother was not present and that they were hungry. Sgt. Sylvia Thomas, supervisor of the Juvenile Division, stated that on November 20, 1976, and December 31, 1976, she received complaints from the front desk concerning parental neglect by Mrs. Hodge. Officer Fitzroy Williams of the Juvenile Division stated that on two occasions, he investigated these complaints. Finally, Patrolman Reuben Rabsatt, also of the Juvenile Division, stated that he was asked by Sgt. Thomas to investigate a report by Mr. Hodge that Mrs. Hodge was not present at home in the morning hours of January 1, 1977. He determined Mrs. Hodge had gone out the night

before and returned at approximately 8:30 a.m. on New Year's day and that no one was left in charge of the children.

Eugene Hatcher of the Department of Social Welfare also testified that he received a complaint by Mr. Hodge and Sgt. Rabsatt that Mrs. Hodge was not caring for the children. He subsequently interviewed Mrs. Hodge on January 3, 1977. She did not deny the incidents. As a result, he advised Mrs. Hodge to get a babysitter to supervise the children during her prolonged absences.

The Court does not find these incidents persuasive as far as Mrs. Hodge's history of caring for her children. Only two occasions are substantiated. Moreover, it certainly is not unusual for one to go out on New Year's Eve. Consequently, while provision should have been made for supervision of the children, I give this very slight weight in determining the award of custody. This is particularly so in view of the fact that when the parties were living together, it was not uncommon to leave the children alone at night.

Nevertheless, I do not find the considerations on which the tender years presumption is based to be present here. Moreover, even assuming its applicability, the plaintiff has not established that the children of the parties are all of tender years. The Court is prepared to concede that the youngest child, Barbara Hodge, at age 9, is of tender years. Clearly, however, the conduct of both parties indicated that they do not believe the two oldest children, Evelina, 15 and Deborah, 14 are of tender years. It also is questionable how tender are Antonio, Jr., at almost 12, and Gerald, at 11. Moore v. Smith, 499 S.W.2d 634 (Ark. 1973).

■■ The plaintiff also argues that even girls of mature years should stay with their mother. It is true that a child's sex may be given some weight depending upon the circumstances, and that where a boy is old enough not to

require his mother's constant care, his interests may best be served by being in his father's custody. H. H. Clark, Jr., Law of Domestic Relations § 17.4 at 585 (1968). I consider sex to be a factor, but it cannot be emphasized too strongly, however, that any such consideration may be outweighed by others. Moreover, the mother's concession that Evelina and Deborah are mature enough to care for themselves and their three younger siblings while Mr. or Mrs. Hodge are working diminishes its importance. In addition, the parties have both agreed that the children shall stay together. See footnote 1, supra. This, of course, is in conformity with the general rule that the best interests of siblings are presumed to be served by placing them in the custody of the same parent and keeping them together. Courts normally avoid separating siblings unless the children's welfare clearly requires such an action. In Re Marriage of Woodward, 228 N.W.2d 74, 75–76 (Iowa 1975); Brashear v. Brashear, 71 Idaho 158, 228 P.2d 243 (1951); Howard v. Howard, 307 Ky. 452, 211 S.W.2d 412 (1948).

██ *Race, religion, culture, and income.* Race, religion, and culture generally play minor roles in custody disputes. At any rate, they are not distinguishing factors between the mother and father here. Similarly, superior financial resources are given little weight by the courts. White v. White, 160 Kan. 32, 159 P.2d 461 (1945). Both parties are employed and have almost identical incomes; thus that, too, is not a factor that influences the outcome of this case.

██ *Parental misconduct.* Courts have considered the conduct and suitability of a parent to have custody as evidenced by character, moral stability, temperament, past conduct and culpability in a divorce. Rogich v. Rogich, 78 Idaho 156, 299 P.2d 91 (1956). Although some jurisdictions hold that a wife's adultery makes her an unfit custodian as a matter of law, most states conclude that it merely creates a presumption against the fitness of an adulterer as

parent to obtain custody. Hild v. Hild, 221 Md. 349, 157 A.2d 442 (1960). Certainly, however, the morals of the parties are relevant to a determination of custody. In Wilky v. Gleason, 303 S.W.2d 266, 267–68 (Ky. 1957), it is stated that:

Indiscretions by a woman with a man whom she thereafter marries do not brand her as unfit to have custody of her young children where there was no evidence of promiscuity . . . nevertheless, misconduct of either parent is a circumstance which may be used by the Chancellor in determining custody.

Mrs. Hodge has admitted her affair with another man, and the evidence establishes that although this affair was kept relatively discreet, the children did become aware of it in mid-October of 1976. Such awareness is probably inevitable in a small, closely knit community such as St. Thomas, and the Court does not find that the children's knowledge of this affair was due to any openly indiscreet acts on the part of Mrs. Hodge. In fact, the children did not become aware of "another man" until August 19, 1976, when Mr. Hodge, having been informed of his wife's unexpected presence in Miami rather than in New Jersey, spoke to her on the telephone. Having thus learned of her apparent adultery while talking on the telephone to his wife in the presence of his children, he cried and became very upset. The children knew he was speaking to their mother, and suddenly realized that their mother was away with another man.

As pointed out, there is no evidence of the wife being openly indiscreet or of her "carrying on" in front of her children. In fact, she obviously tried to hide her affair from everyone, including her husband. Certainly the wife's conduct is not sufficient for this court to find her unfit to have custody of the children, and I do not so find. However, the Court must consider the impact of this affair on the attitudes and mental health of the children. It is quite

574

evident, after interviewing the children, that some are very much distressed by their mother's extra-marital relationship.

 *Capacity for supervision and training.* The ability of a parent to care for a child as revealed by past performance is another relevant consideration. Mullen v. Mullen, 188 Va. 259, 49 S.E.2d 349 (1948). I find that the father often involved himself with the children's recreation, and that a warm relationship was fostered between the children and the father. The mother appears to have concerned herself more with discipline. Her understanding of discipline, by her own admission, involved beating the children "whenever I deemed necessary." To her, a beating is "a good beating with a strap or something like that." Mr. Hodge, however, does not believe in beating children and there is no evidence he has ever done so. Mrs. Hodge believes her husband is "very close to his children" and "actually spoils them." This Court will not impose its view of child rearing or discipline upon the parties. However, I do find that the use of straps to the extent that they cause welts and bruises, as the testimony of Mrs. Hodge and her children establishes, is not appropriate as a normal disciplinary measure.

The Court also has difficulty with Mrs. Hodge's habit of waking the children in the middle of school nights to clean a mess they may have left. Mrs. Hodge admitted to waking the children between 2:00 and 3:00 a.m. to clean the house on school nights. Although a parent should foster a sense of responsibility in his or her children and carrying out household chores is a part of fostering such an attitude, I am disturbed by the disruption of the children's needed rest on school nights. Again, this disparity in attitude is not sufficient to find Mrs. Hodge to be an unfit mother, but it does weigh in favor of the husband.

■ *Parent's desire for custody.* The strength and sincerity of the desire for the child's custody is still another factor. H. H. Clark, Jr., Law of Domestic Relations, § 17.4 at 586 (1968). From all the evidence and my observation of the demeanor of the parties, I find that the Defendant's love for his children appears stronger. Mrs. Hodge admits that Mr. Hodge is very close to his children, and his conduct both prior and subsequent to the parties' separation confirms this. In spite of the separation, the father has seen his children almost every day. He takes the boys fishing and the girls to movies. When speaking of them, his tone of voice and expressions reflect his concern and affection. Mr. Hodge testified that all of his children are very close to him and that he never hides anything from them. A similar attitude was not apparent on the part of Mrs. Hodge.

■ *The children's preferences.* If a child is old enough to form an intelligent judgment about his or her custody, this choice also is to be given weight, but it, too, is not conclusive. Jones v. Jones, 64 N.W.2d 508, 516 (Minn. 1954). The Pennsylvania Superior Court in In re Custody of Carlisle, 225 Pa.Super. 181, 310 A.2d 282 (1973) ruled that the lower court did not abuse its discretion in subordinating the tender years doctrine in favor of the stated preference of two sons, ages 12 and 13, to be placed in the custody of their natural father.

Through counsel, the parties stipulated to the Court's conducting private interviews with each of the five children in chambers without the presence of counsel. The Court's hope was to make this proceeding as painless, informal and unintimidating as possible for the children, and still be able to ascertain their understanding of the proceedings, their relationship with their parents, and their preferences for custody. I sat with each child on a couch in chambers, dressed informally without my judicial robe. Present was a

court reporter and my law clerk, who took notes of the children's testimony.

Evelina Hodge, age 15, was nervous but willing to talk. She is presently attending the tenth grade at Charlotte Amalie High School, and has on numerous occasions acted as the head of the household, being the oldest child. Evelina learned from one of her friends about her mother's relationship with another man. Evelina spoke of a close relationship with her father. She says she doesn't know how her parents feel about each other, but feels that her father does love her. Her preference for living with her father was strongly demonstrated by the testimony of her mother, father and grandmother, and the fact that after the October 6, 1976, hearing before Judge Michael, she went to live with her grandmother and refused to live with her mother until ordered to do so by Judge Michael. Even after being ordered to return home with her mother, she continued to spend considerable time at her grandmother's.

Deborah Hodge, age 14, is a lively and cheerful girl. She is presently in ninth grade at Charlotte Amalie High School and enjoys Caribbean History, English, home economics and gym. Deborah says that she gets along well with her father. She stated that her mother "knocks her" when she does not obey, and that this occurs frequently. She thinks her father wants her to live with him, but is not sure her mother wants her. Her preference is to live with her father.

Antonio Hodge, Jr., age 11, was clearly the most deeply scarred by his parents' marital difficulties. He was extremely reticent, and had great difficulty communicating, particularly when asked his parents' relationship or their problems. Antonio is presently in the sixth grade at the Mandahl School, and enjoys playing baseball. He spoke of his father's taking him to St. John and fishing at the Caribbean Harbour Club. He says he sees his father almost

577

every day, and believes that his father wants him to live with him, which is his preference.

Gerald Hodge, age 11, knows that his parents are getting divorced and this makes him sad. He is in the fifth grade and doesn't like school. He says he likes both parents, but he likes his father better, and wants to live with him. He says his mother beats him. Gerald clearly wasn't happy about the situation between his mother and father.

Barbara Hodge, age 9, was self-composed and seemed to be cheerful and full of vitality. She is attending grade four at the Mandahl School, and enjoys math, spelling, and English. Barbara appears to be much more academically oriented than the other children, and spends much of her free time studying. Barbara is angry with her parents for not living together. Her preference also was to live with her father.

The Court found all of these children to be intelligent and alert and of maturity commensurate with their ages. I further find the oldest two children to be capable of making an intelligent choice. Cf. In re Carlisle, 225 Pa.Super. 181, 310 A.2d 280, 282 (1973). The Court also finds persuasive the fact that all five, when interviewed individually, expressed a preference for living with their father. However, the children's preference is but one factor that must be weighed along with the others previously mentioned. The Court does note that under 15 V.I.C. § 822, minors over 14 years or older may nominate their own guardian. This statute adds to the weight to be given the preference of Evelina and Deborah, and other jurisdictions with similar statutes have so held. See, e.g., Aaron v. Aaron, 305 S.W.2d (Ark. 1957).

 *Environment and surroundings.* The environment and surroundings in which the child is to be reared also are important considerations. Stifflemire v. Williamson, 250 Ala. 409, 34 So.2d 685 (1958). The parties have agreed that

578

whoever is granted custody of the children shall be allowed to reside with them in the present marital home. Consequently, the place of residence is not a factor in favor of either party. Mrs. Hodge, however, testified that she plans to marry her man friend after her divorce is granted, and that she "hopes to wait at least six months after I get divorced" before remarrying. The children of the parties have never met this man, except for one incident where Deborah saw him at a local store. Mrs. Hodge's husband-to-be has eleven children of his own, four of whom presently live with him. He also presently is engaged in a divorce proceeding, which would terminate his second marriage.

The Court must consider the psychological impact this will have on the family structure. The plaintiff called a Department of Welfare Social Worker, Eugene Hatcher, as an expert witness, and the Court allowed him to testify as such. Mr. Hatcher, who has a Bachelor of Arts degree in sociology, a Masters degree in psychology, and two Associates degrees in law enforcement, runs psychotherapy sessions for parents of delinquent children, and has had ten years experience in the field of social work. He was present throughout the trial and listened to all of the testimony except that of the children. Consequently, the Court must give some weight to his predictive analysis of the impact upon the children of Mrs. Hodge remarrying and bringing a new husband into the home with the children. Mr. Hatcher stated that the presence of a new husband would be an unknown factor psychologically, but believed that there would be serious adjustment problems. It also is not unreasonable to expect that the children might feel hostility toward this individual whom they would naturally tend to believe was the source of their parents' difficulties.

 Plaintiff's counsel, however, argued that if Mrs. Hodge's affair has poisoned the children's minds against their mother, then the mother should be granted custody to

avoid a permanent rupture of the mother-child relationships. The Court is obviously concerned about the future relation between Mrs. Hodge and her children, and she is free to control her future conduct with regard to her children. The Court, though, only can consider what is best for the children, not what is best for the mother or the father. Should custody be granted to the father with liberal rights of visitation to the mother, there is nothing to prevent Mrs. Hodge from attempting to nurture a warm and supportive relationship with her children. However, I conclude this would be more difficult to accomplish with the presence of another man, particularly where that man had an extended affair that contributed to the mother's divorce from the children's father.

Consequently, from a review of all of the evidence adduced and its application to the legal standards, a trial judge must decide what is best for the future life of children begotten by the divorcing parents. There are no assurances that my decision is the "right" one, but I have concluded that it is in the best interests of these children to award their custody to their father, Osborne Antonio Hodge. I emphasize that this decision is in no way to be considered as a punishment or reward for past conduct. Hagen v. Hagen, 226 N.W.2d 13, 15 (Iowa 1975). It is reached with one purpose in mind: what is in the best interests of the children? In keeping with that goal, Mrs. Geraldine Hodge shall be granted reasonable rights of visitation with the hope that the mother-child relationship may be preserved and fostered. I will not spell out in detail an elaborate visitation schedule at this time, and hope one will not be necessary in the future.

The parties have indicated that once the Court decided who should have custody the other issues would resolve themselves. Accordingly, I will leave it to the parties to divide their personal property in an equitable manner.

■ The Court must, however, also make provision for the support of the children. Both parties earn approximately the same amount of money as police officers. Mr. Hodge has submitted a budget calling for expenditures of $1,081 a month if he were granted custody, and calling for a contribution by the mother of $373 a month. Some of the items in Mr. Hodge's budget are questionable, particularly the items relating to the husband's monthly expenses having to do with previously incurred debts. Mrs. Hodge's proposed budget indicates monthly expenses of $786 with a net income of $814. Some of these items are also questionable, such as gasoline and rent. The Court, however, does not believe it has to look at either budget item by item. Mrs. Hodge has stated that she has saved $1,250 and that if the Court awarded custody to Mr. Hodge, she would be willing to pay child support in the sum of $350 per month. I do not feel she would make such an offer if she did not feel capable of affording this sum. However, in view of her income, projected expenses, savings and offered child support, I find that she is capable of contributing $300 a month and will so order her to pay that amount as support for the parties' five children.

■ Although Mr. Hodge might be said to be the prevailing party, I do not believe it appropriate in this case that either side be awarded attorney's fees or costs, and each side should bear his or her own costs and attorney's fees.