**Berdye Levin et al., Appellants, v. C. K. Hunter et al., Appellees.**

**Gen. No. 46,536.**

First District, First Division.

June 13, 1955.

Released for publication September 15, 1955.

David J. Ratner, and George J. Miller, of Chicago, for appellants.

Goldberg, Devoe, Brussell & Shadur, and Abraham W. Brussell, of Chicago, for certain appellees; Milton I. Shadur, Abner J. Mikva, and Robert Plotkin, all of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Berdye Levin and Flora T. Rivkin, the owners of forty per cent of the stock of the Steger Building Corporation, filed a complaint in equity against the corporation, the owners of sixty per cent of the stock and three of the four directors to invalidate an election of directors held on June 8, 1951, and to enjoin the execution of a ten-year noncancellable management

contract to Hogan & Farwell, Inc. The cause was referred to a master in chancery, whose report was adverse to the plaintiffs. Their objections were overruled and allowed to stand as exceptions. The chancellor overruled the exceptions and entered a decree dismissing the complaint for want of equity. Plaintiffs, appealing, ask that the decree be reversed and that the cause be remanded with directions to sustain their objections to the master's report and to proceed in such a manner to afford them the relief prayed.

The corporation is the owner of a long-term leasehold estate on land improved with a nineteen-story office building situated at the northwest corner of Jackson boulevard and Wabash avenue in Chicago. In 1944 the leasehold was owned by trustees who employed Hogan & Farwell, Inc., (hereinafter called the agent), engaged in the real estate management business, to manage the property. A written contract was entered into for a period of one year and from year to year thereafter but subject to the right of the owner to cancel at any time on sixty days' notice. It provided that the agent would be paid five per cent of the gross rentals and the regular Chicago Real Estate Board rates for new tenants secured. In the latter part of 1946 one of the beneficiaries sold her ⅑th interest in the leasehold to the agent. At about that time the agent was endeavoring to purchase the remaining ⅚ths interest. The Steger interests contracted with Nathan Allen to sell him their ⅚ths interest. The agent filed a complaint to enjoin the sale on the ground that it had an option to purchase these interests. This litigation was settled by an agreement between Allen and the agent under which the parties would participate equally in the acquisition of the entire leasehold estate. The written agreement of February 24, 1947, embodying the terms of the settlement, provided that a new corporation would be formed to acquire the property; that each of the two parties would own fifty per cent of the

stock; that the agent would be given a written management contract for one year and from year to year thereafter unless terminated by either party in a written notice; and that the agent would receive the compensation hereinbefore mentioned.

Accordingly, the corporation was organized under the Business Corporation Act of this state, with an authorized capital of 400 shares and the Articles of Incorporation were issued on March 18, 1947. Subscribers to the stock were Leo L. Hogan, C. K. Hunter, Nathan Allen and Oscar L. Paris, each of whom subscribed for 100 shares. Hogan was president of the agency corporation. Paris was an associate of Allen. Hogan is now deceased. Hunter is a defendant. The Articles of Incorporation provided that the Board of Directors shall consist of four members. On March 31, 1947 the four subscribers held the first meeting of shareholders and elected themselves as directors to serve until the first annual meeting of shareholders or until their respective successors are elected and qualified. On the same day the directors held their first meeting and adopted bylaws which provided that the Board of Directors would consist of four members. They elected Hunter as president, Hogan as treasurer, Paris as vice president and Allen as secretary. On April 1, 1947 a series of corporate meetings were held whereby the shareholders and directors authorized the purchase of the leasehold and approved various other matters, including the execution of a management contract with the agent. On April 1, 1947 Hogan and Hunter each received a certificate for 100 shares of stock and the other 200 shares were issued to Allen and his associates.

Although Hogan and Hunter thus became the owners of record of fifty per cent of the stock, neither they nor the agent ever had any actual financial interest therein. The real owners of the shares were five people whom the agent had interested in the acquisition of the

fifty per cent interest purchased under the settlement agreement with Allen. Two of these were Berdye Levin and Flora T. Rivkin. The other three were Arthur L. Myrland, Eleanor Coit Lill and Emily A. Trier, who are defendants. The five are collectively referred to as the agency group. They paid for the 200 shares which the agent had subscribed for them, each contributing $\frac{1}{5}$th. Hunter and Hogan continued to hold the stock in their names as nominees until May 25, 1948, when it was transferred to the members of the agency group, each member receiving 40 shares or $\frac{1}{10}$th of the capital stock.

Prior to the special meeting of shareholders held on June 8, 1951, out of which the litigation arose, the members of the agency group had not participated personally in a corporate meeting. During this period of more than four years certain shareholders' meetings were held, all but one of which Hogan and Hunter attended as owners of the 200 shares which they received as nominees for the members of the agency group. The one exception was a meeting held on August 25, 1948, following the death of Hogan. Hunter attended that meeting and was reported as the owner of record of the 200 shares owned by the agency group even though these shares had been transferred of record to the members of the group on May 25, 1948. Throughout the period prior to June 8, 1951, Hunter continued to act as a director. Hogan acted as a director until his death in 1948, when he was replaced by Otis L. Hubbard, who like Hunter and Hogan was a stockholder, director and officer of the agent. The other two directors during this period were Allen and Paris. The election of Hunter and Hogan and Hunter and Hubbard as directors was accomplished at meetings attended by Hunter and Hogan or by Hunter alone as nominees for the real owners of the stock. Throughout that period of time there were directors' meetings attended by Hunter (and likewise by Hogan until his death and

465

thereafter by Hubbard). Hunter continued throughout the whole period to be president of the corporation. Hogan was treasurer until his death, at which time Hubbard became treasurer and thereafter continued to act as such. At all meetings of the shareholders and directors Hunter presided as chairman. He testified that in taking part in the meetings he was doing so as the agent and nominee of the members of the agency group. Nowhere in the minutes covering the period prior to June 8, 1951 are the names of the members of the agency group mentioned. Throughout this period the agent managed the property. For the period of three years and ten months from April 1, 1947 to January 31, 1951, the total amount of commissions paid to the agent in connection with the management of the building was more than $62,000. In addition the agent placed the insurance carried by the corporation during that period and received commissions thereon.

In February 1951 Allen procured a written offer for the purchase of all the stock based on a gross price of $525,000. He submitted the offer to Hunter and told him that he and his associates were willing to accept the offer. The settlement agreement provided that if such an offer were made and if it was acceptable to one of the parties but not to the other, the party not desiring to sell would have sixty days in which to purchase the interest of the other party at fifty per cent of the price offered by the proposed purchaser, and that in the event the party not desiring to sell did not make such a purchase within that time, then both parties would be obligated to sell. Hunter informed the members of the agency group of the receipt of the offer and discussed with them the matter of whether they wished to accept it or exercise the option to buy the stock of the Allen group. Harold Levin and Maurice Rivkin, the husbands of plaintiffs and who had successful experience in business directly related to the maintenance of buildings, at all times acted for their wives in all

matters pertaining to the building. Hunter advised the agency group to buy out Allen and Paris instead of selling their interest and that the property was worth substantially more than the offered price. All the members of the agency group including plaintiffs agreed to participate in the acquisition of the stock. Hunter testified and the master and the court found that he told Levin and Rivkin that if they decided to buy he would not charge a commission on the deal but would expect a long-term management contract and that this arrangement was satisfactory to all the group, including plaintiffs. No commissions were paid.

Hunter thereupon employed a law firm to represent the agency group in the transaction. This firm had previously represented the agent in various matters. The firm prepared a written contract for the signatures of the members of the agency group whereby the members would authorize the agent to consummate the purchase. This document contained a provision that each purchasing stockholder agrees to exercise his or her best efforts toward the end that the agent should be employed as managing agent for the building for the term and upon the terms and conditions set forth in the management agreement attached thereto. All members of the group signed and delivered copies of the contract. When the drafts of the contract were signed and delivered to the agent's office there was no management agreement attached thereto. Although Hunter had intended that the management contract be physically attached to the purchase agreement when the latter was signed by members of the syndicate, he was out of town at the time of its execution, and as a result of the oversight the management contract was not attached. When he returned Hunter showed the contract to the various syndicate members and Levin and all others, except Rivkin, initialed and okayed it. The contract provided, among other things, for a ten-year noncancellable term. Subsequently, Rivkin consulted

with Levin and they informed Hunter that they would not agree to it. The master found that in view of the facts surrounding the signing of the agreement plaintiffs had in fact agreed to the long-term management, and also that Hunter told Levin he felt he had a commitment on the long-term management contract, but if Levin felt he had to go along with Rivkin, he (Hunter) would continue to operate on a year-to-year contract.

The closing of the deal for the acquisition of the Allen stock about the middle of April 1951 resulted in each member of the agency group acquiring twenty per cent of the stock of the Allen group and twenty per cent of the total stock outstanding. At the closing of the purchase deal the attorney representing the purchasers received the minute book of the corporation and the resignations signed by Allen and Paris as directors and officers. He took the book to his office where it has been ever since. Nothing was done about the resignations of Allen and Paris as directors until late in the month of May 1951. On May 28, 1951 Hunter resigned as a director. He and the attorney testified that this was done on the latter's advice. In giving that advice the attorney was acting for Hunter and for the agent. At this time the other three members of the syndicate were closely associated with Hunter through business transactions and had given him their consent to the proposed new management agreement. Sometime in the latter part of May 1951 Hunter had discussions with Myrland, Lill and Trier pertaining to the proposed election of directors. He testified that in the course of these discussions he and the three majority stockholders agreed that on the next board their group would have three members. Hunter further testified that Myrland and Trier did not wish to go on the board and that it was agreed that Lill was to become one of the directors and that he, Hunter, suggested that the attorney Devoe also be made a director. Levin and

468

Rivkin were not included in these discussions. Similar discussions were had between Hunter and Devoe.

On May 29, 1951 a notice of a special meeting of stockholders, signed by Hunter as president and mailed to the shareholders, stated that a special meeting of the shareholders would be held on June 8, 1951 to consider the resignations of Hunter, Allen and Paris as directors, and if accepted, to fill the vacancy or vacancies thereby created. At that time the Board of Directors consisted of four members, as provided by the bylaws. Hunter, in conversations with Lill, Trier and Myrland, representing sixty per cent of the stock, decided that their directors should be Hubbard, Devoe and Lill. The master credited Hunter's testimony that under the new setup he envisioned there would be five directors, one representing each twenty per cent of the stock and that the bylaws would be changed to accomplish this. All of the stock was represented by proxies. Throughout the meeting the minute book was on the table. The minutes recite that a motion to accept the resignations of Allen, Paris and Hunter was made by Devoe and seconded by the proxy of Rivkin and unanimously carried. Thereupon the nomination and election of Devoe, Lill and Rivkin as directors was accomplished by unanimous vote. Plaintiffs say that it is a mathematical fact that if an election were to be held on June 8, 1951 for four directors, the proxies which Hunter procured would not be sufficient to elect three out of the four; that if the three shareholders from whom Devoe received the proxies nominated three candidates and if each plaintiff nominated one, and if the votes of each shareholder were cast in favor of his own candidate, each candidate would receive exactly the same number of votes, and since there would be five candidates and only four directorships, the result would be a deadlock, and that it is equally true that in an election to fill three directorships, Devoe as a proxy

469

for sixty per cent of the voting power would be able to elect two of the three no matter how plaintiffs divided their votes.

The only conflict in the evidence relating to the meeting concerns an inquiry directed to Devoe as to when the last annual meeting had been held for the election of directors. Plaintiffs maintain that Devoe replied that a meeting had been held in spring, to which Levinson, who held the proxy of Flora T. Rivkin, rejoined, "Well, if it had been held there is no use holding it over again." That conversation was denied by Devoe. He testified that after the formal meeting was concluded he said to Levinson: "The last annual meeting of this corporation had not been held. Do you see any purpose in holding it," and he said "No." Devoe admitted that on the day of the meeting he knew that no annual meeting of the shareholders had been called since 1948. Rivkin and Levin testified that the first time they knew there had not been an annual meeting of the shareholders in 1951 was when their attorney (who was out of the city on June 8, 1951) returned and they learned of it in his office. They further testified that prior to the meeting they had never seen the bylaws or the minute book of the corporation and that at the time of the meeting they did not know what provisions the bylaws made with reference to the holding of an annual shareholders' meeting. Mrs. Rivkin testified that at no time up to the day of the meeting had she seen the minute book, that she did not know when, prior to June 8, 1951, the last meeting of the stockholders was held, and that on June 8, 1951 she had no knowledge pertaining to the terms of the office of the directors. It was stipulated that if Mrs. Levin testified her testimony would be the same as that of Mrs. Rivkin. Hubbard was present at the stockholders' meeting. The directorship then occupied by him was not put up for election. Within a week after the meeting of June 8, 1951 the attorney for plaintiffs

470

called upon Devoe, accompanied by Levinson. He was shown the minute book. The testimony as to the conversation between the attorney for plaintiffs and Devoe is somewhat conflicting. The master found that when Levinson went to the meeting he knew that an annual meeting for 1951 had not been held. The conference a week subsequent to the meeting of June 8 was the first occasion in which the election was challenged. It was also the first time that plaintiffs pointed out the mathematical quirk whereby in an election for a full Board of Directors, plaintiffs, with a forty per cent stock interest, could block the election of a majority of directors by the majority stockholders. Hunter's position was that there should be five directors. Plaintiffs rejected this suggestion unless the five directors could be mutually agreed upon. Plaintiffs thereupon filed their suit.

Plaintiffs maintain that the manner in which the principal defendants conducted the election of directors on June 8, 1951 was a fraud upon the plaintiffs and a breach of the fiduciary obligations of these defendants. The bylaws provided that the Board of Directors shall consist of four members. When the meeting was called there were four members but their terms of office had expired. They had been elected on August 25, 1948. The minutes recording the fact state that they were elected to serve until the next annual meeting of the shareholders or until their respective successors are elected or shall be qualified. The bylaws provided that an annual meeting of the shareholders shall be held on the second Monday in April of each year beginning in 1948 for the purpose of electing directors and for the transaction of such other business as may come before the meeting. Section 34 of the Business Corporation Act [Ill. Rev. Stats. 1953, ch. 32, § 157.34; Jones Ill. Stats. Ann. 32.034] provides that at each annual meeting the shareholders shall elect directors to hold office until the next succeeding annual meeting. Plaintiffs

471

point out that by virtue of the bylaws and the statute and in accordance with the wording of the minutes of August 25, 1948, the terms of office of the four directors who were elected on that date expired on the second Monday of April 1949. The annual meeting which should have been held on the second Monday of April 1949 was not held; nor was there any annual meeting held in April 1950 or April 1951; nor was there any special meeting of shareholders held subsequent to August 25, 1948 for the election of directors. The bylaws also provided that if an election of directors shall not be held at the meeting on the date designated or at any adjournment thereof, the Board of Directors shall cause the election to be held at a special meeting of the shareholders as soon thereafter as convenient. The statute is to the same effect.

Plaintiffs state that the record contains ample proof that the election was fraudulently conceived and carried out. They point out that at the time of the election and at all times prior thereto Hunter was aware of the pertinent facts which made it improper to proceed with a piecemeal election; that the shareholders' meeting of August 25, 1948 furnishes a parallel to the situation surrounding the meeting of June 8, 1951; and that the meeting of 1948 was called because of a vacancy caused by the death of Hogan, at which time the terms of office of the four directors had expired, having been elected at the first shareholders' meeting on March 31, 1947 to serve until the annual meeting scheduled to be held according to the bylaws in April 1948 and which meeting was never held. Plaintiffs say that it is significant that Hunter, as chairman of the meeting of August 25, 1948, called for the election of a full Board of Directors, thereby recognizing that the terms of office of all the directors then incumbent had expired and that the proper procedure was to elect four directors; that if Hunter had pursued the same course which he had adopted at the 1948 meeting he would have

472

now called for the election of a full Board of Directors, and that in calling for and electing three directors he ignored the provisions of the bylaws and the Business Corporation Act. Plaintiffs also state that the motive of the agent and its representatives in calling for a "piecemeal election" was to gain control of the corporation and insure the continuous management of the property by the agent and that with such control it would not be necessary to put the ten-year contract into effect.

Plaintiffs assert further that if the proper meeting were called for, defendants could not control the board and that at best the election would have resulted in a deadlock. Devoe knew that no annual meeting had been held. Plaintiffs charge that the purpose of Devoe in representing that an annual meeting had been held was to mislead the representatives of plaintiffs so that they would not object to the fact that the meeting was not being conducted for the election of a full Board of Directors.

■ We agree with the defendants that the findings of the master and the chancellor that there is no proof of fraud or any breach of fiduciary obligations on the part of defendants are supported by the record. From the meeting in 1947 until 1951 the members of the syndicate were content to leave in the hands of the officers of the agent the management of the building and the handling of the corporate affairs, including their representation on the Board of Directors. Throughout this period there were no formal annual meetings and no request for a meeting by any shareholder. There was no evidence that members of the agency group or the Allen group had any desire to change the corporate officers or directors from year to year. During all of this time the Allen group had possession of the corporation books and Allen, an attorney, handled the legal affairs of the corporation including the setting up of corporate minutes. When the agency group bought out

473

the Allen group in 1951 Allen and Paris submitted their resignations as directors as part of the deal. Hunter testified that he desired to resign in the event the matter of the management contract should come before the Board of Directors and that Devoe had so advised him.

We are satisfied that at the time of the June 8 election plaintiffs were aware that no annual meeting had been held and that the master and chancellor were right in so finding. Plaintiffs were represented by experienced businessmen and attorneys. The bylaws and minute book were available to them. In fact, an attorney representing one of the plaintiffs examined the minute book page by page and made extensive notes on such examination. Neither plaintiffs nor defendants attached any significance to calling a special election to fill vacancies rather than an election for a full board. Neither plaintiffs nor defendants gave any thought to failure to hold annual meetings. Plaintiffs assume that some or all of the defendants, prior to June 8, 1951, knew of the mathematical quirk whereby plaintiffs could block the election of three directors by a majority of the stockholders in an election to replace the entire board. The testimony establishes that the first awareness of this fact on the part of the defendants was when the attorney for plaintiffs, after the June 8 meeting, advised defendants' representatives of that fact. It appears that plaintiffs were not aware of the mathematical quirk until after the June 8 meeting. Defendants speculated on what would have occurred had the special meeting been treated as equivalent to an annual meeting with an election for all four directors. Defendants point out that if a deadlock had occurred the old directors would have continued in office as holdover members of the board.

We agree with plaintiffs that under the provisions of the Business Corporation Act and the bylaws

the terms of the four directors had expired. There should have been an election of four directors at the annual meeting in April. There had been no election since August 25, 1948. Both the statute and bylaws provide that a director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. The predecessors of the persons who were elected at the June 8 meeting had no unexpired terms. The word "term" in a legal sense means the fixed and definite period of time which the law describes that an officer may hold office and a holder over does not change the length of a term but results in shortening the period served by his successor. Wilson v. Shaw, 194 Iowa 28, 36. Plaintiffs concede that "they continued to be directors even after the date came and passed for the holding of said annual meeting, but they were directors without any terms. They were merely holding over in accordance with law." There can be no doubt that stockholders who freely participate in an election of directors are bound thereby and that the doctrine of waiver is applicable in such cases. Sherrard State Bank for use of Moberg v. Vernon, 243 Ill. App. 122, 126; 13 Am. Jur., Corporations, Secs. 484, 524. Plaintiffs had full knowledge that no annual meeting had been held and participated in the election. They knew it was a special meeting called for considering the resignations of Hunter, Allen and Paris and filling those vacancies if the resignations were accepted. The bylaws and the minutes were available to them for examination. Levinson nominated Rivkin who represented one of the plaintiffs and he was elected. As the master pointed out, the uncontradicted testimony is that Hunter told plaintiffs that if they refused to honor their agreement as to the management contract he would not hold them to their obligation but would go along on a year-to-year basis. We agree with the finding of the chancellor and master that the question of

a long-term management contract was fairly and openly discussed with plaintiffs and that there was no proof of fraud relating to it.

Plaintiffs insist that they seek the aid of a court of equity to enforce the rights given to them under the Business Corporation Act and particularly under Section 28 [Ill. Rev. Stats. 1953, ch. 32, § 157.28; Jones Ill. Stats. Ann. 32.028], which governs the voting power of each shareholder. The law contemplates that corporations shall be controlled by a majority of the stockholders acting through directors elected by them in person or by proxy. Luthy v. Ream, 270 Ill. 170, 177; People ex rel. Snapp and Pogue v. Younger, 238 Ill. App. 502, 505; First Nat. Bank of Waterloo v. Fireproof Storage Bldg. Co., 199 Iowa 1285, 1293, 202 N. W. 14, 17, 18. Plaintiffs voted their shares at the June 8 meeting and elected a director to represent them. Equity will not aid them to force a deadlock and dissolution on the majority stockholders.

A careful consideration of the record convinces us that the chancellor decided the case correctly. Therefore, the decree of the superior court of Cook county is affirmed.

Decree affirmed.

FRIEND and NIEMEYER, JJ., concur.