**TODD P. JUNG, Appellant/Petitioner**

**v.**

**MARIA RUIZ, Appellee/Respondent**

S. Ct. Civil No. 2012-0142

Supreme Court of the Virgin Islands

November 19, 2013

H.A. CURT OTTO, ESQ., H.A. Curt Otto, P.C., St. Croix, USVI, *Attorney for Appellant*.

EMILE A. HENDERSON III, ESQ., Law Offices of Yvette D. Ross-Edwards, St. Croix, USVI, *Attorney for Appellee*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, Associate Justice.

## OPINION OF THE COURT

(November 19, 2013)

HODGE, *Chief Justice*. Todd P. Jung appeals from the decision of the Family Division of the Superior Court entered on December 5, 2012, which granted Maria Ruiz's Motion to Amend Settlement Agreement, permitting Jung and Ruiz's daughter to relocate with Ruiz to Sarasota, Florida. For the reasons discussed below, we affirm.

## I. STATEMENT OF RELEVANT FACTS AND PROCEDURAL POSTURE

On February 13, 2006, Jung and Ruiz entered into a settlement agreement, which was approved by a Superior Court Order dated February 28, 2006. (J.A. 124-29.) Pursuant to this agreement, the parties shared joint legal and physical custody of their daughter I.J., a minor, until her fourth birthday, after which, either party could petition the court for a change in the physical custody arrangement, if that party was of the opinion that "the best interests of [I.J.] require[d] a change . . . ." (J.A. 124-29.)

On August 17, 2012, Jung emailed the Superior Court Judge, the Honorable Patricia Steele, stating that he had received a telephone call from the Good Hope School, where I.J. was enrolled, informing him that

Ruiz was attempting to withdraw the child from the institution because they were relocating. (J.A. 239, 244.) At the time, Ruiz was on vacation in Sarasota with I.J. (J.A. 239.) In his email, Jung indicated that he had emailed Ruiz about the situation but had not received a response. (*Id.*) Later that day, subsequent to Jung's correspondence with the court, Ruiz sent Jung an email, which she noted had been "stuck" in her drafts folder. (J.A. 245.) In the email, Ruiz stated that she had been laid off from her employment with HOVENSA, a large oil refinery and major employer located on St. Croix, and had been unable to find other work on St. Croix, but that she had accepted a job in Sarasota and registered I.J. in a "Grade A elementary school." (*Id.*) Ruiz noted that Sarasota was a better place to raise a child because it is less dangerous and could provide more opportunities for I.J. than could St. Croix. (*Id.*)

On August 20, 2012, Jung filed an Emergency Petition to Prohibit the Removal of the Minor from St. Croix, wherein he argued that Ruiz's unilateral action of withdrawing the child from the Good Hope School and enrolling her in an institution in Florida violated the terms of the settlement agreement, as Ruiz did not seek to change the custody arrangement through the court. (J.A. 240.) Ruiz responded that she had "every intention of filing for the modification [of] physical custody with the court upon her return to the Territory." (J.A. 250.) The court granted Jung's motion in an order dated August 20, 2012. (J.A. 255.)

On September 12, 2012, Ruiz filed a Motion to Amend Settlement Agreement, stating that she was forced to move due to employment issues and was attempting to transfer I.J. to the Alta Vista Elementary school in Sarasota. (J.A. 256.) Jung opposed the motion, arguing that Ruiz had failed to demonstrate that the move was in the best interests of the child. (J.A. 260-63.) Among other things, Jung included with his opposition photos of I.J. at his home, report cards showing that she was doing well in school, lists of activities available on St. Croix, and a letter indicating that, pursuant to his request, V.I. Paving — a company of which he was vice president and part owner — was offering Ruiz a job paying $30,000 per year. (J.A. 264-307.)

The court held a hearing in the matter on November 2, 2012. At the hearing, Ruiz testified that she had worked for HOVENSA since 1999, but was laid off on July 31, 2012. (J.A. 320.) After unsuccessfully searching for employment in the Territory, she was able to find work in Sarasota — specifically, Ruiz indicated that she was offered a job as an

accounts executive with Bankers Insurance and as an office manager with 15 South Restaurant, paying $40,000 and $45,000 respectively. (J.A. 321, 328.) She stated that she wanted I.J. to move with her because at her age — almost nine years old — it was best for I.J. to be with her mother. In response to an inquiry as to why I.J. could not remain on St. Croix, Ruiz further emphasized that "the island economically is going down, crime is up.[1] Bills are going up. It's hard to find a good paying job in St. Croix." (J.A. 321-22.) Ruiz reasoned that I.J. always enjoyed visiting Florida, that she had several relatives her age there, and that there were more opportunities and places to go like "parks [and] museums," whereas on St. Croix, all she could do was "go[] to the beach and spend[] time with family." (J.A. 323, 330-31.)

In regards to the job offer with V.I. Paving, Ruiz explained that she "would not want to work for [I.J.'s] father for prior history." (J.A. 343.) Jung, however, indicated that the positions V.I. Paving offered Ruiz fell under the direction of someone other than himself, and that he would not be overseeing Ruiz's work, nor would he have the authority to fire her, although he would be her employer in the sense that he owned shares in V.I. Paving, and was thus, a partial owner of the company. (J.A. 364-65, 383-84.)

Jung also testified about his relationship with I.J. and provided his rationale for the child staying on St. Croix. He testified that he believed 80% of the students at I.J.'s school attended college after graduation and that the student to teacher ratio was 15:1 — therefore, I.J. received a lot of attention at the school; he also noted that she loved school and provided report cards that demonstrated that she was performing well at Good Hope. (J.A. 349.) Jung reasoned that if I.J. were to move with Ruiz, a change in her environment or a possible change in class size could affect her performance as a student. (J.A. 371.) Jung also provided several pictures of his home, showing I.J.'s room and her pool, and noted that she had four dogs and a talking green macaw as pets at his house. (J.A. 357-59.) In addition, Jung noted that he had a girlfriend who worked as

---

[1] Jung submitted that the violent crime rate in Sarasota "exceeded the [national] average by 143%" in 2010. (J.A. 336.) Ruiz admitted that she had not looked into the crime statistics of Sarasota, but believed it was fine because it seemed fine and she had family that lived there. (J.A. 335.) She indicated that the increasing crime on St. Croix caused her to be more cautious when going to functions with her daughter, although she had not "not taken [I.J.] to anywhere" as a result of this caution. (J.A. 341.)

an animal scientist at the University of the Virgin Islands and lived with him; they had been in a healthy relationship for over two years and he intended to propose to marry her later that year. (J.A. 361.) Jung's girlfriend testified to having a good relationship with I.J. as well, and stated that I.J. had "a really good relationship" with Jung. (J.A. 394, 396-97.)

Pursuant to the original settlement agreement establishing the custody arrangement, both parents were allowed three weeks of vacation time with I.J. each year; Jung noted that he vacationed with I.J. twice a year, and indicated during cross-examination that it did not appear that the move would prohibit him from continuing to take his vacations with his daughter. (J.A. 346, 369-70.) Further, he explained that he would continue to provide for I.J. if she moved and agreed that she could make friends · anywhere. (J.A. 377-78.) Jung also acknowledged that I.J. was born in Sarasota. (J.A. 389.)

The court, ruling from the bench, ultimately awarded physical custody of I.J. to Ruiz, granting her motion to amend the settlement agreement. In reaching this decision, the court first highlighted that "the parties are no strangers to the [c]ourt[,]" noting that they had been before the court on several occasions over the years, and opined that both parents love I.J. and had done a wonderful job with her. (J.A. 402.) The court then referred to the HOVENSA refinery, stating that,

> [u]nfortunately, we are living in the time now where circumstances are changing and our lives have been turned upside down by the closure of [HOVENSA]. And I don't think anybody can minimize the impact that the closure of [HOVENSA] has had on the quality of life in the Virgin Islands, as well as the lives of families that worked there because there are many cases.

(J.A. 402-03.) The court discussed the trend of families living in different areas, and children living primarily with one parent as a result, noting that such an arrangement "does not necessarily result in any harm to the child" and that "[t]his is exactly where we find ourselves" in this matter. (J.A. 403.) The court continued, stating,

> [I.J.] is a nine year-old girl. Her mom has been offered employment opportunities in Florida. By her mom's testimony, as well as her dad's testimony, she loves Florida. She loves New York. Okay. The oppor-

1055

tunities that are available to . . . [I.J. in] Florida [are] that, number one, it is close to the Virgin Islands. The wonderful things that we enjoy about living in the Virgin Islands are all available in Florida as well.

We are also fortunate to be in a situation where, you know, Mr. Jung has a good job. He's part owner of a company. He has some flexibility. He can move about pretty much at his pace if he so chooses.

And so the [c]ourt is going to grant the motion and permit the child to relocate with her mother to Florida.

(J.A. 404.) Jung prompted the court to "provide findings as to what specifically . . . warrant[ed] that the child be with the mother as opposed to the father[,]" to which the court responded: "there has been a change in circumstances. And in this particular instance, as the [c]ourt said, I can't split the child. There are those cases where children will do well either place. In the particular instance, no I can't split the child. I cannot split the child." (J.A. 406-07.) Jung reasoned that there was no evidence concerning I.J.'s home in Florida, her school, or what she would be doing there; however, the court declined to provide additional findings. (J.A. 407.)

Jung appealed from the court's oral ruling in an emergency motion to vacate, stay or in the alternative, for reconsideration, dated November 16, 2012. In support of this motion, Jung provided a letter indicating that V.I. Paving offered to increase Ruiz's salary to $45,000 if she accepted the position with the company. (J.A. 14.) Jung argued that the court had found changed circumstances based on the $15,000 difference in Ruiz's potential salaries, and so the subsequent offer from V.I. Paving matching the Florida salary, alleviated any changed circumstance. The court denied Jung's motion in an Order dated December 4, 2012, and entered December 5, 2012. (J.A. 6.) In a separate order entered on the same date, the court memorialized its oral ruling from the November 2 hearing. (J.A. 3-4.) Jung filed a timely notice of appeal on December 19, 2012. (J.A. 1-2.)

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

■ "The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees [and] final orders of the Superior Court . . . ." V.I. CODE ANN. tit. 4, § 32(a). An order that "disposes of all

of the claims submitted to the Superior Court for adjudication" is considered final for purposes of appeal. *Matthew v. Herman*, 56 V.I. 674, 677 (V.I. 2012). Because the Superior Court's December 5, 2012 Order modifying the custody arrangement disposed of all the claims submitted for adjudication, the Order was final, and this Court has jurisdiction over Jung's appeal.[2]

We review the Superior Court's findings of fact for clear error, but exercise plenary review over its legal conclusions. *Petrus v. Queen Charlotte Hotel Corp.*, 56 V.I. 548, 554 (V.I. 2012) (citing *Mercer v. Bryan*, 53 V.I. 595, 598 (V.I. 2010)). The Superior Court's custody determination is reviewed for an abuse of discretion. *Madir v. Daniel*, 53 V.I. 623, 630 (V.I. 2010).

## B. Best-Interests Analysis

In *Madir*, we recognized that the "best interests of the child" standard governs custody determinations in the Virgin Islands. *Id.* at 632. However, we also noted that the Legislature has not defined factors that a court must consider when deciding a child's best interests[3] and declined

---

[2] In Jung's Amended Notice of Appeal, he seeks review of "the conclusions of the Superior Court as set forth in the Order dated December 4, 2012 and entered by the Superior Court on December 5, 2012." (J.A. 1.) Notably, both the order modifying the custody arrangement and the order denying Jung's motion for reconsideration were entered on December 5. However, despite Jung's failure to clearly describe the order from which he appeals, the notice could reasonably be interpreted to refer to both orders. *See Bernhardt v. Bernhardt*, 51 V.I. 341, 346-47 (V.I. 2009) (explaining this Court's jurisdiction extends to orders not specified in a notice of appeal if " 'there is a connection between the specified and unspecified order, the intention to appeal the unspecified order is apparent and the opposing party is not prejudiced and has a full opportunity to brief the issues.' " (quoting *Williams v. Guzzardi*, 875 F.2d 46, 49 (3d Cir. 1989))). Nevertheless, because Jung did not advance an argument in his appellate brief concerning his motion for reconsideration, and because he further suggested that the motion is "more appropriately viewed as supplement[al] ... evidence" and that the two orders be "treated as the same" (Appellant's Br. 1), we review only the Superior Court's decision to modify the custody arrangement. *See* V.I.S.CT.R. 22(m) (issues raised but not briefed are deemed waived on appeal).

[3] In ruling on custody applications, the trial courts have identified several factors bearing on the best interests of the children involved. *See Smith v. Cedano*, 24 V.I. 11, 13-15 (V.I. Super. Ct. 1988) (conducting best-interests analysis); *Rogers v. Rogers*, 14 V.I. 130, 136, 138 (V.I. Super. Ct. 1977) (holding that a modification of a custody order pursuant to 16 V.I.C § 110, requires that the party seeking modification show a substantial change in circumstances; finding "morals and conducts of the parties," "[t]he custodial environment of the children," "[t]he desire of a parent for custody," and "[t]he children's custodial preferences" to all be

to judicially adopt criteria, stating that the task "is best left to the Legislature." *Id.* at 634 n.7.[4] Although we concluded that the best interests of the child are paramount, we emphasized that it is not this Court's role to define which factors must be considered; rather "our task . . . is to ensure that the Family Division of the Superior Court did not abuse its discretion" in its custody determination. *Id.* at 634.

---

factors relevant to determining the best interests of a child for purposes of a custody award); *Hodge v. Hodge*, 13 V.I. 561, 568-80 (D.V.I. 1977) (considering "[t]he ability of a parent to care for a child as revealed by past performance," the desire for custody, the preferences of the children, the children's environment, and parental misconduct in determining the best interests of the children pursuant to 16 V.I.C. § 109(a)).

[4] In his appellate briefs, Jung advocates that we apply the standard set forth in section 2.17 of the Principles of the Law of Family Dissolution, promulgated by the American Law Institute in 2002 ("Principles"), which describes considerations that should be used to determine a child's best interests in a joint custody situation when one parent is relocating. Jung cites to title 1, section 4 of the Virgin Islands Code, which provides that "[t]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute . . . shall be the rules of decision in the courts of the Virgin Islands . . . absent local laws to the contrary[,]" in order to suggest that the Principles should govern this case. He refers specifically to the "Director's Foreword," which explains that the American Law Institute opted to draft Principles rather than a restatement because most of the relevant law in the area of family law is statutory — as such, the Principles were designed to assist legislatures and courts in drafting and interpreting their own laws. Nevertheless, the fact remains that although the Principles may contain the recommendations of the American Law Institute, they are *expressly* not a restatement. Moreover, adoption of a restatement is subject to this Court's authority to shape the common law, and is, thus, not mandatory. *Banks v. Int'l Rental and Leasing Corp.*, 55 V.I. 967, 974-80 (V.I. 2011).

While correctly recognizing that this Court has cited to the Principles in *Madir*, Jung still fails to acknowledge that after our review of the Principles revealed "competing considerations" and "numerous ways to determine a child's best interests," we also declined to adopt factors for consideration during a best-interests analysis, deciding instead that such a task was best left to the Legislature. 53 V.I. at 634 n.7. Similar to the discussion in the Principles concerning factors relevant to the best interests of a child, generally — the discussion of factors relevant to the modification of a custody arrangement when one parent seeks to relocate, contained in section 2.17, also includes competing interests and numerous methods to determine the child's best interests. PRINCIPLES § 2.17. Moreover, in the "Chief Reporter's Foreword," the drafters note in regards to Chapter 2 — which contains section 2.17 — that although the chapter may be utilized by courts to interpret and apply their own statutes, it is preferable that the provisions be adopted through legislation. Accordingly, considering the above, as well as the fact that the Virgin Islands does not have a statutory provision providing factors to balance when modifying a custody arrangement, we decline to deviate from the spirit of our stance in *Madir* — that the designation of particular criteria to govern this set of circumstances is a matter that is best left to the Legislature.

On appeal, Jung contends that the Superior Court did not conduct a best-interests analysis and encourages this Court to determine the best interests of I.J. *de novo*. He highlights section 2.17 of the Principles of the Law of Family Dissolution ("Principles"), as well as case law from other jurisdictions, as a benchmark for the manner in which the court should have evaluated I.J.'s best interests, and asserts that the necessary assessment did not take place. In particular, Jung cites to *Herrell v. Herrell*, 144 Wis. 2d 479, 424 N.W.2d 403, 407 (1988), for the proposition that a court should not change a joint custody agreement into a sole custody arrangement unless the person seeking the change has demonstrated that it is *"necessary* to the child's best interests," a "more stringent" test derived from applicable state statutes. (Emphasis added). Likewise, Jung refers to *In re Marriage of Johnson*, 266 Mont. 158, 879 P.2d 689, 696 (1994), where the court required the relocating parent to show that the children's present environment "seriously endangered their physical, mental, moral, or emotional health" in order to warrant revision of the custodial arrangement.

Section 2.17 of the Principles discusses the modification of a custody arrangement, where relocation constitutes a substantial change in circumstances, in three scenarios: (1) where the relocating parent exercised a clear majority of the custodial responsibility, PRINCIPLES § 2.17(4)(a); (2) where neither parent exercised a clear majority of custodial responsibility, PRINCIPLES § 2.17(4)(b); and (3) where the relocating parent exercised substantially less custodial responsibility, PRINCIPLES § 2.17(4)(d). Jung suggests that even if the court found that Ruiz exercised a clear majority of custodial responsibility — which he disputes — she did not comply with the provision's requirements that her relocation be for a valid purpose, in good faith, and to a reasonable location.[5] *See* PRINCIPLES § 2.17(4)(a). In the alternative, Jung contends

---

[5] Importantly, a comment to section 2.17(4)(a)(i) of the Principles notes that "what is a 'clear majority' of custodial responsibility should be established through a rule of statewide application[,]" although the Principles suggest that a clear majority exists where the parent exercised 60-70 percent of the custodial responsibility. *Id.* cmt. d. Moreover, this comment indicates that the court's role is not to determine whether a parent should be allowed to move, but rather, concerns only "the extent to which custodial arrangements . . . should be modified." *Id.* The Principles favor the rights of a parent exercising a clear majority of the responsibility for the child, and do not require a showing that the relocation is in the child's best-interests, where the relocating parent exercises a clear majority of responsibility, so long

that neither parent had exercised a clear majority of custodial responsibility — consequently, the court should have evaluated "the effect the relocation would have on the child" and "whether a parent has engaged in an effort to deprive the other party of a relationship with the child" — factors described in the Principles and the statutes and case law of other jurisdictions. (Appellant's Br. 22-23.) He asserts that in failing to weigh these factors, the court did not consider I.J.'s best interests. (*Id.*) Further, Jung suggests that the court found that St. Croix was per se harmful to a child and allowed relocation on that basis. Specifically, he contends that even if the court were to have found that Ruiz exercised substantially less custodial responsibility, the court could have allowed Ruiz to relocate with I.J. based on section 2.17(4)(d) of the Principles only if Ruiz showed — and the court accepted — that relocation was necessary to prevent harm to the child because it would be harmful for her to remain in St. Croix.[6]

Importantly, Jung and Ruiz shared joint physical custody of I.J. pursuant to their mediation settlement agreement, and the parties do not suggest that the actual time spent with I.J. differed greatly from this arrangement.[7] In such an arrangement, Jung correctly recognizes that the Principles and the case law in several states indicate that an assessment

---

as the decision to relocate is for a valid purpose, to a location reasonable in light of that purpose, and is done in good faith. PRINCIPLES § 2.17, cmt. d. Courts in some states have declined to adopt this approach, applying a best-interests analysis regardless of whether the relocating parent is the primary custodial parent. *See, e.g.*, *Tropea v. Tropea*, 87 N.Y.2d 727, 665 N.E.2d 145, 150-51, 642 N.Y.S.2d 575 (1996); *Yannas v. Frondistou-Yannas*, 395 Mass. 704, 481 N.E.2d 1153, 1157-58 (1985).

 Nevertheless, considering we have previously declined to adopt the provisions set forth in the Principles, and there is no comparable rule defining what constitutes a "clear majority" in the Virgin Islands, we decline to determine — for the first time on appeal — whether Ruiz exercised a clear majority of custodial responsibility, or whether she was entitled to a presumption in her favor upon a showing that the move was for a valid purpose, in good faith, to a reasonable location.

[6] This argument is without merit. While Ruiz opined that St. Croix was not a good place to raise a child, the court's determination that the economy in St. Croix was suffering does not appear to have been based on any determination that St. Croix was "per se harmful." Rather, the court appears to have relied on Ruiz's testimony concerning her difficulty in obtaining another job, as well as personal knowledge from other similar cases the court confronted due to the HOVENSA closure.

[7] The settlement agreement provided that Ruiz "shall have actual physical custody of [I.J.] from Tuesday morning through Saturday afternoon, and [Jung] shall [have] actual physical custody of [I.J.] from Saturday afternoon thru Tuesday morning." (J.A. 125.)

of I.J.'s best interests should have been of particular importance. *See, e.g.,* *Maynard v. McNett,* 2006 ND 36, 710 N.W.2d 369, 376-77 (2006) (recognizing that where both parents shared joint physical custody of the child, they were both custodial parents — accordingly, as modification of the arrangement to permit a parent to relocate would require the court to declare a primary custodian, the relocating parent would need to demonstrate "a significant change in circumstances and [that] the best interests of the child would be served by . . . moving with the relocating parent"); *Potter v. Potter,* 121 Nev. 613, 119 P.3d 1246, 1250 (2005) (in joint physical custody arrangement, "[t]he issue is whether it is in the best interests of the child to live with parent A in a different state or parent B in [the current state]"); *Brown v. Brown,* 260 Neb. 954, 621 N.W.2d 70, 78 (2000) ("[A]s a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the[ ] burdens [of demonstrating a legitimate reason for moving and that it is in the child's best interests to live in the new location]. Nonetheless, whether we are considering a modification of custody or a proposed removal from the state, the best interests of the children are the paramount considerations in our determination."); PRINCIPLES § 2.17 cmt. e (where neither parent was the primary custodial parent "there is little choice but to reassess the custodial arrangements under the best-interests test . . . . consider[ing] all relevant factors, including the potential disruptive effects of the relocation itself and its potential benefits"). However, despite these guidelines as to relevant concerns under these circumstances, no comparable statutes or requirements have been applied by an appellate court in the Virgin Islands in this scenario.[8]

■ Accordingly, our role is to simply determine whether the manner of the Superior Court's analysis and the factors the Superior Court did

---

[8] The Virgin Islands does have a code provision that loosely considers the best interest of the child in the context of a divorce decree: Section 109 of title 16 notes that the court may give "due regard to the age and sex of such children and . . . primary consideration to the needs and welfare of such children," and provides in the context of domestic violence, that "a determination by the court that the domestic violence has occurred raises a rebuttable presumption that it is in the best interest of the child to reside with the parent who is not the perpetrator." 16 V.I.C. § 109(a)(1), (b). The section also discusses factors for determining visitation and custody, particularly in the event that domestic violence has occurred. 16 V.I.C. § 109(c).

consider "rest[ed] upon . . . clearly erroneous finding[s] of fact, an errant conclusion of law[,] or an improper application of law to fact." *Stevens v. People*, 55 V.I. 550, 556 (V.I. 2011) (quoting *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003)). A finding of fact is clearly erroneous only where it " '(1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data.' " *Madir*, 53 V.I. at 630 (quoting *St. Thomas-St. John Board of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007)). Based on this standard, and in the absence of any statutory factors to apply, we find that the Family Division of the Superior Court did not abuse its discretion in awarding physical custody of I.J. to Ruiz, *Madir*, 53 V.I. at 630, although we recognize that the court could very well have included more substantive findings in its ruling.

From the record, it appears that the Superior Court based its decision on the following determinations: (1) that I.J. was a nine-year-old girl; (2) that both parents loved I.J. and had done a wonderful job raising her; (3) that the closure of HOVENSA and resulting economic downturn, as well as the impact of the closure on the lives of persons in the Virgin Islands, coupled with Ruiz's job loss and potential employment opportunities in Florida, constituted a substantial change in circumstances; (4) that I.J. loved Florida; (5) that Florida is close to the Virgin Islands and boasted comparable opportunities to those available in the Virgin Islands; (6) that this was a situation where the child would do well in either location, with either parent; and (7) that because Jung was a partial owner of V.I. Paving, he had a good job and flexibility and could move about at his own pace. Seemingly, based on these conclusions, the court granted Ruiz's motion to amend the custody arrangement, and also modified the terms to provide Jung additional visitation time. (J.A. 405.)

 In *Madir* we noted that "[t]he requirement that courts give priority consideration to the 'child's interest over those of the competing adults is premised on the assumption that when a family breaks up, children are usually the most vulnerable and thus most in need of the law's protection.' " 53 V.I. at 632 (quoting PRINCIPLES § 2.02 cmt. b). Arguably, the Superior Court's determination in this matter is wanting because, unlike in *Madir*, 53 V.I. at 628, where the Superior Court had considered "the respective home environments, the ability of each parent to nurture the child, whether either parent was guilty of any abuse or neglect, the interrelationship of the child to the parents and other individuals who

were present in the home, the ability of the child to interrelate to siblings, and the willingness of each parent to provide a stable home environment for the child," the Superior Court's decision concerning I.J. is less clearly derived from such factors, as the court did not, in its oral ruling or its written order, provide very much insight into its reasoning.

Nevertheless, the court's reasoning on the record was not clearly erroneous. The court found that I.J. loved Florida and would have comparable opportunities there — a finding that was supported by both Ruiz's and Jung's testimony that I.J. enjoyed visiting Florida, as well as Jung's testimony that the child could engage in the majority of the activities he indicated were available to her in St. Croix, in Florida. (J.A. 323, 346, 372-73.) Moreover, Jung testified that he believed I.J. could make friends anywhere and that she was very smart, which would support the court's position that the child would do well in both places. The record also supports the court's findings that both parents loved I.J. and were doing a wonderful job, as the desire of both to maintain custody, as well as testimony that the child was happy, (J.A. 394), and that Jung did not disagree that Ruiz was a good mother, (J.A. 374), could serve as evidence for both conclusions. Further, the record supported the finding that the closure of HOVENSA had negatively impacted the quality of life for some residents of the Virgin Islands — Ruiz testified that while she had obtained two job offers in Florida, she had been unable to find anything comparable in St. Croix.[9] (J.A. 320-21.) Ruiz's testimony supported an inference that relocation was necessary and that she was acting in good faith, rather than simply attempting to destroy the joint physical custody arrangement she previously shared with Jung. Additionally, Jung testified that he owned shares in V.I. Paving and was Vice President of the company — although he did not specifically state that he had a flexible schedule and could move about at his own pace, the record supports such

---

[9] Although V.I. Paving did offer Ruiz employment and Jung did testify that Ruiz would not be in a position supervised by him, considering the history between the parties, the court did not abuse its discretion in failing to find that the job offer eliminated the changed circumstances. Moreover, at the time of the hearing, the offer was for a job paying $15,000 less than Ruiz's other offers, and Ruiz noted that $30,000 a year would be a difficult salary on which to survive. Although the offer was increased to $45,000 and brought to the court's attention in Jung's motion for reconsideration, we decline to evaluate whether the new information justified reconsideration, as Jung's brief does not adequately request review of that motion. V.I.S.CT.R. 22(m).

an inference based on the status of his position and his demonstrated ability to take numerous vacations with I.J. (J.A. 383-84.) Moreover, Ruiz testified that Jung would be able visit, stating that "for at least every three months he can visit Florida whenever he likes and visit [I.J.]." (J.A. 321.)

 Accordingly, while it might have been helpful and even desirable for the court to have issued additional findings specifying why it determined that it was in I.J.'s best interests to be with her mother *over* her father; particularly in light of the amount and substance of evidence concerning I.J.'s relationship with her father and life on St. Croix, as compared to the lack of definitive statements regarding I.J.'s proposed life in Florida or information pertaining to the relationship between I.J. and her mother,[10] it still cannot be said that the court arbitrarily placed I.J. with Ruiz.[11] Rather, it appears that the court considered I.J.'s age, her

---

[10] The evidence on the record indicated that I.J. was performing well at the Good Hope School, had spent a substantial amount of time living with her father under the then-existing joint physical custody arrangement, and had a good relationship with Jung and his girlfriend, who looked after I.J. in Jung's absence. Further, Jung and his girlfriend provided testimony describing Jung's methods for disciplining I.J., and their practice of helping her with her homework, in addition to photos and details about their home. Similar information was not developed concerning I.J.'s potential environment in Sarasota. While Ruiz did explain that I.J. had family in Sarasota — Ruiz's sister would be their neighbor and there were five nephews her age nearby — there was little other description of I.J.'s school and potential home, nor was there any discussion illuminating I.J.'s relationship with her mother or her mother's parenting practices. Although in Ruiz's motion to amend the settlement agreement, she noted that she sought to transfer I.J. to Alta Vista Elementary School in Sarasota, which she described in her email notifying Jung of her relocation, as a "Grade A" elementary school. Also, during the hearing, Jung presented a photo of a condominium which Ruiz indicated looked like the place she would be living in Sarasota.

[11] Contrary to the assertion of the dissent, we do not assume that the trial court considered the relevant factors relating to the child's best interest. Rather the trial court itself emphasized its consideration of those factors including, *inter alia*, the child's sex, age, relationship to both parents, particularly the mother, that there was no adverse effects to relocating to Florida, specifically the child's relationship to both locations including family relationships and the presence of similar aged children and the fact that she would have access to the father because of his job position. *See Costantini v. Costantini*, 446 Mich. 870, 521 N.W.2d 1, 2 (1994) (the factors to consider in relocation include whether the prospective move has the capacity to improve the quality of life for both the custodial parent and the child, as well as the degree to which the court is satisfied that there will be a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the parental relationship with the noncustodial parent if removal is allowed.); *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 NW2d 592, 601 (1999) (court did not abuse its discretion in permitting custodial parent to relocate with child where distance was not so great as to prevent non-custodial parent's visitation on a regular basis and the number of visitation days was increased to make

gender, the fact that she enjoyed Florida and that both parents appeared to have done well raising her, coupled with the mother's changed circumstance and the father's high position of employment, and came to the conclusion that it would be best to allow the child to relocate with her mother.[12] As emphasized in *Madir*, we are not in the position to determine, in the first instance, which factors should have been considered by the court, but instead must assess whether the court's conclusion — and whatever considerations were involved — constitutes an abuse of discretion. See 53 V.I. at 633-34. In this case, we find that it did not.

## III. CONCLUSION

For the reasons discussed, we affirm the Order of the Superior Court entered December 5, 2012, which modified the custody arrangement between Jung and Ruiz, granting Ruiz physical custody of I.J. and Jung visitation. The record does not indicate that the Superior Court abused its discretion in allowing I.J. to relocate with her mother, nor does the court's reasoning appear to be based on clearly erroneous findings of fact.

---

up for reduced number of visits). Further, while the trial court did consider factors affecting the parents, it did not as the dissent suggests, subrogate the child's best interest with those of the parents. Rather the trial court considered the parents interest in relation to the child's best interest. *See Baures v. Lewis*, 167 N.J. 91, 770 A.2d 214, 229 (2001) ("In a removal case, the parents' interests take on importance. However, although the parties often do not seem to realize it, the conflict in a removal case is not purely between the parents' needs and desires. Rather, it is a conflict based on the extent to which those needs and desires can be viewed as intertwined with the child's interests.").

[12] In the Joint Appendix, Jung includes several examples of the difficulties he has had with Ruiz concerning custody of I.J. over the years, and suggests the court erred in apparently failing to consider these incidents. In particular, he provided reference to disputes over visitation and vacation plans, (J.A. 121-22, 157, 160, 208-38), difficulty contacting the child using phone numbers provided by Ruiz, (J.A. 158-59, 181) (in contravention of the terms of the settlement agreement), unsubstantiated accusations of drug use, (J.A. 167, 196), as well as information concerning a previous incident wherein Ruiz sought modification of the custody arrangement, based on allegedly false claims against Jung. (J.A. 201.) Further, Jung references Ruiz's failure to seek modification of the custody arrangement through the court before apparently withdrawing I.J. from school as evidence of bad faith. (J.A. 240-42.) While each of these incidents may call into question which parent would better serve I.J.'s best interests, it does not necessarily follow that the court's ultimate determination was an abuse of discretion, as the court had the authority to balance and discern between the competing considerations.

CABRET, *Associate Justice*, dissenting. In *Madir v. Daniel*, 53 V.I. 623, 631-32 (V.I. 2010), we noted that the Legislature was silent as to both the standard and factors relevant to child custody adjudications. But we explained that the Legislature

> has expressly stated that the primary considerations in awarding custody as part of a divorce proceeding are the needs and welfare of the child. Considering this expression of the Legislature's intent, the requirements that family courts consider the best interests of the child in other domestic relations proceedings involving visitation, adoption and support, and the need to protect the vulnerable interests of a child in a custody dispute, it is clear that the Legislature intends for Virgin Islands courts, like courts in other jurisdictions, to resolve custody disputes according to the best interests of the child. Indeed, we can discern no reason why the Legislature would intend to apply a different standard in original child custody proceedings than in other proceedings concerning child custody, visitation, and support. Accordingly, we conclude that *the best interests of the child should be the paramount concern of a court presiding over . . . child custody dispute[s] between the child's parents.*

*Madir*, 53 V.I. at 632 (emphasis added). Here, the record demonstrates that the Superior Court failed to consider I.J.'s best interests in modifying the custody arrangement. Because the majority affirms the Superior Court's decision to modify I.J.'s custody despite the court's failure to consider the best interests of the child, I respectfully dissent.

In granting Ruiz sole custody, the Superior Court never identified "the best interests of the child" in either its ruling from the bench or in its December 4, 2012 Order. (J.A. 3-4, 402-07.) Instead, the court emphasized only that a substantial change in circumstances had occurred. And when prompted by Jung to "provide findings as to what specifically . . . warrant[ed] that the child be with the mother as opposed to the father," the court replied, *"there has been a change in circumstances,"* but failed to explain how this change affected I.J.'s best interests. (J.A. 406-07 (emphasis added).) As the majority acknowledges, (Maj. Op. at 1060-1061), a finding of substantial change in circumstances is required before the court can modify a custody arrangement, *see, e.g., Willis v. Davis*, 2013 WY 44, 299 P.3d 88, 91 (Wyo. 2013) ("If a material change in circumstances cannot be shown, the doctrine of *res judicata* applies to

the original order."), but the best interests of the child must remain the Superior Court's "paramount concern" in determining child custody. *Madir*, 53 V.I. at 632. Even though the court found changed circumstances, it stopped short of considering I.J.'s best interests — in light of the new circumstances — and therefore failed to follow *Madir*.

A trial court, in considering a child's best interests, must necessarily give priority to " 'the child's interests over those of the competing adults,' " because " 'when a family breaks up, children are . . . the most vulnerable parties and thus most in need of the law's protection.' " *Madir*, 53 V.I. at 632 (quoting PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION § 2.02 cmt. b (2002)). But the Superior Court applied the wrong standard here by placing the parents' interests — and ultimately the mother's — over the interests of I.J. Specifically, the court focused on Ruiz's financial and personal needs, her loss of employment at HOVENSA, her inability to find comparable employment on St. Croix, and her refusal to accept a job offer from V.I. Paving to avoid a personal sacrifice, namely, a $15,000 pay-cut. (J.A. 334.) Similarly, testimony about the increasing crime and declining economy on St. Croix tenuously, if at all, touched upon I.J.'s needs and best interests. As Jung argued at the close of the hearing, the trial court heard "no evidence regarding the child's home [in Florida] . . . no evidence regarding the child['s] school there . . . no evidence regarding what specifically the child would be doing there . . . *nothing*." (J.A. 407 (emphasis added).) In fact, Ruiz testified that she had not secured employment or housing in Sarasota, considerations that would have directly concerned I.J.'s needs and best interests. By contrast, Jung offered evidence that I.J. was doing well in school and receiving "[s]traight A's in everything," (J.A. 347); that the student-to-teacher ratio at I.J.'s school was favorable, (J.A. 348); and that I.J. loved her school. (J.A. 349.) Jung also testified about the home he made for I.J., and introduced photographs of his house, I.J.'s bedroom, and I.J.'s pets. (J.A. 357-60.) And yet the record is replete with instances where the court focused on the parents' interests without considering the child's needs or best interests, remarking that "it is harder for the parents than it is for the children, and this case is no exception. This is exactly where we find ourselves." (J.A. 403.) This makes it clear that I.J.'s best interests were not the trial court's "paramount concern" in this proceeding, distinguishing this case from *Madir*, where we held that the child's best interests were properly considered when the Superior Court

1067

consider[ed] the respective home environments, the ability of each parent to nurture the child, whether either parent was guilty of any abuse or neglect, the interrelationship of the child to the parents and other individuals who were present in the home, the ability of the child to interrelate to siblings, and the willingness of each parent to provide a stable home environment for the child.

*Madir*, 53 V.I. at 632. Here, the trial court had the discretion to consider these — or any other — relevant factors in determining I.J.'s best interests, but lacked the discretion to subrogate the child's interests with those of the parents. *Madir*, 53 V.I. at 634 (the trial court cannot "arbitrarily decide the issue, but instead [must] consider[] numerous factors *related to the best interests of the child*." (emphasis added)).

In affirming, the majority enumerates the factors the trial court did consider and, by stating that "it might have been helpful . . . for the [trial] court to . . . specify[] why it determined that it was in I.J.'s best interests to be with her mother over her father," assumes that the court in fact considered those factors in relation to the child's best interests. (Maj. Op. at 1061-1063, 1064.) The majority concludes that in "the absence of any statutory factors to apply" in custody determinations, the Superior Court cannot abuse its discretion so long as its findings are not clearly erroneous. (Maj. Op. at 1061-1062.) Although I agree that the Superior Court's findings were not clearly erroneous, the decision to modify child custody without considering the child's best interests necessarily rests on an "improper application of law to fact," which — regardless of how well the record supports the court's *incomplete* findings — constitutes an abuse of discretion and reversible error. *Stevens v. People*, 55 V.I. 550, 556 (V.I. 2011) (an improper application of law to fact is an abuse of discretion). Accordingly, I would reverse the Superior Court's December 4, 2012 Order modifying I.J's custody arrangement and remand for a proper consideration of I.J.'s best interests.