**SYMONE JAMES, Appellant/Respondent**
**v.**
**SAMUEL FAUST, Appellee/Petitioner**

S. Ct. Civil No. 2015-0070
Supreme Court of the Virgin Islands
September 6, 2016

Lee J. Rohn, Esq., Lee J. Rohn and Associates, LLC, St. Croix, USVI,
*Attorney for Appellant.*

SAMUEL FAUST, Fort Pierce, FL, *Pro se*.

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice*.

## OPINION OF THE COURT

(September 6, 2016)

CABRET, *Associate Justice*. The mother appeals the Superior Court's July 22, 2015 custody order awarding the father physical custody of their minor child. Because the Superior Court failed to explain its reasoning under the second step of the procedure mandated by *Tutein v. Arteaga*, 60 V.I. 709, 721 (V.I. 2014), we are unable to meaningfully review its custody determination and therefore vacate the Superior Court's custody order and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is the second appeal stemming from a custody award of the same child. The facts underlying the first custody award were set forth in this Court's disposition of the prior appeal, where we vacated and remanded an award of physical custody to the father. *James v. Faust* (*James I*), 62 V.I. 554, 556-58, 564 (V.I. 2015). In that decision, we held that the Superior Court erred by (1) failing to follow the two-step procedure mandated by *Tutein* and (2) making ambiguous and improper findings.[1] *Id.* at 559-63. We also instructed the Superior Court to "set out a permanent custody arrangement after following the *Tutein* procedure and affording the parties an opportunity to examine the guardian *ad litem* under oath in accordance with [the parents'] procedural due process rights." *Id.* at 564.

On remand, the Superior Court held a second custody hearing on May 13, 2015. The guardian *ad litem* testified at length about the findings

---

[1] The Superior Court's vacated custody order included ambiguous findings because it did not identify which parent would exercise physical custody of the child after August 30, 2018, or define the term "parenting time" as used within its order. *James I*, 62 V.I. at 561-63. It included improper findings because it weighed the mother's status as primary caretaker in favor of the father. *Id.* at 560-61.

within his May 13, 2014 home study report.[2] He also testified that, since filing the May 13, 2014 report, he learned that each parent had a child with their significant others, that the mother's work schedule had changed to day shift, 9:00 a.m. to 5:00 p.m., and that the mother moved with the child, her fiancé, and their infant child from her parents' home on St. John to a caretaker's house, also located on St. John. Based on this information, he recommended that the mother receive physical custody subject to liberal visitation, explaining that he

> considered the fact that the mother has been the primary caretaker for [the child] from his birth until present. . . . And because the mother was the primary caretaker I didn't see any reason to remove the minor child from the mother.
>
> . . . .
>
> I [also considered] the fact that at the time [the child] was five years of age, [he] had grown up with his mother and his mother's household, his maternal grandfather there, grandmother, the mother's sisters, and . . . all the things he had experienced up until that point here in the Virgin Islands . . . that was what he was accustomed to. I thought [awarding physical custody to the father] probably would have caused a disruption in his life.

The child's paternal grandmother, Julie Ann Faust, testified that she lives near her son in West Palm Beach Florida, and noted that many of her family members — brothers, sisters, children, and grandchildren — also lived in Florida. Faust explained that she believed it was in the child's best interests to award the father physical custody because of his maturity and dedication to the child.

The father, consistent with his testimony from the previous February 20, 2014 custody hearing, reiterated that he believed that he should receive physical custody so that he could draw upon his professional and volunteer experience working with children and adolescents to be a more active role model in his child's life.

The maternal grandparents, Oscar and Avis James, explained that the maternal grandfather picks up the child from school most days and takes

---

[2] That home study report, which did not include a recommendation, described the father as "fully capable" with "a lot to offer his son," and the mother as "organized and neat," noting that the child "always seemed happy and comfortable" living on St. John with the mother.

the child to their home, where he is cared for by his maternal grandmother and extended family until his mother picks him up after work. They both testified that they strongly disliked the father.

The mother's fiancé, Ian Samuel, testified that he resides with the mother, the child, and their infant child at Peter Bay in a caretaker's house. He explained that he often picks up the child from school and cares for him until the mother returns from work.

The mother, consistent with her testimony from the previous February 20, 2014 custody hearing, reiterated that she believed that she should receive physical custody because she had raised the child from birth and he was happy in St. John. Unlike her earlier testimony, however, she described the father as "too controlling," and "very manipulative," and reported an instance of corporal punishment, in which the father allegedly struck the child on the legs resulting in marks. Nonetheless, she did not object to shared legal custody or visitation.

On July 22, 2015, the Superior Court issued an order awarding the father sole physical custody "on or before August 10, 2015." It also awarded alternating "parenting time (visitation)" to the mother and the father for summer and winter vacations. The mother filed a timely notice of appeal with this Court on August 4, 2015, and subsequently, an emergency motion for a stay pending appeal on August 6, 2015.

In an opinion issued August 7, 2015, we granted the mother's emergency motion for a stay pending appeal, concluding that the mother had established a substantial case on the merits because the Superior Court failed to "directly address" the impact of relocation on the child's best interests, and it may have impermissibly " 'weigh[ed] the rights and interests of the father rather than the child.' " *James v. Faust*, S. Ct. Civ. No. 2015-0070, 2015 V.I. Supreme LEXIS 24, **5-7 (V.I. Aug. 7, 2015) (unpublished). We now address the mother's appeal.

## II. JURISDICTION

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court, or as otherwise provided by law." V.I. CODE ANN. tit. 4, § 32(a). The Superior Court's July 22, 2015 order deciding the custody rights of the parents was a final order within the meaning of section 32(a), and therefore we have jurisdiction over the appeal. *James I*, 62 V.I. at 558 (citing *Tutein*, 60 V.I. at 714).

## III. DISCUSSION

 The mother argues that the Superior Court abused its discretion by awarding the father physical custody because it rejected the guardian *ad litem*'s recommendation without sufficiently addressing the effects of relocation on the child or properly weighing the mother's role as the primary caregiver in her favor. We retain plenary power to determine whether the Superior Court adhered to the terms of our mandate. *Caribbean Healthways, Inc. v. James*, 59 V.I. 805, 810 (V.I. 2013) (citing *Shaffer v. Bd. of Sch. Dirs. of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 n.1 (3d Cir. 1984)). While we review the Superior Court's award of child custody for an abuse of discretion, *James I*, 62 V.I. at 559 (citing *Madir v. Daniel*, 53 V.I. 623, 630 (V.I. 2010)), we remain mindful that such review is meaningful only if the Superior Court sufficiently explains its reasoning. *Id.* In applying this standard, we review the Superior Court's legal holdings *de novo* and its findings of fact for clear error. *Tutein*, 60 V.I. at 721 (citing *Madir*, 53 V.I. at 630). Under clear error review, we defer to the Superior Court unless its determination is either completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data. *Id.* (citing *Bradford v. Cramer*, 54 V.I. 669, 673 (V.I. 2011)).

 The Superior Court's July 22, 2015 custody order, unlike its earlier vacated custody order, is supported by a much more robust body of factual findings and legal conclusions.[3] But it nonetheless failed to comply with the full breadth of this Court's remand instruction. In *James I*, we instructed the Superior Court to engage in the two-step procedure identified in *Tutein* when evaluating a custody dispute: first, it must "outline a set of relevant factors that it intends to use in determining the best interests of the child," and second, it must " 'explain how its findings of fact regarding those factors are supported by the evidence introduced at the hearing.' " 62 V.I. at 558-59 (quoting *Tutein*, 60 V.I. at 721). Consistent with our instruction, in the proceedings on remand the Superior Court outlined a set of relevant factors: (1) the respective home

---

[3] In the factual findings and conclusions of law accompanying the July 22, 2015 order, the Superior Court made 48 findings of fact and 21 conclusions of law, which it separated into two distinct numbered lists.

354

environments; (2) the ability of each parent to nurture the child; (3) whether either parent was guilty of any abuse or neglect; (4) the interrelationship of the child to the parents and other individuals who were present in the home; (5) the ability of the child to interrelate to siblings; (6) the willingness of each parent to provide a stable home environment for the child; (7) the findings of the guardian *ad litem*; (8) the quality of the time that the child spends with each parent; and (9) the effort put forth by the non-custodial parent. The Superior Court did not, however, sufficiently explain how its findings of fact regarding those factors were supported by the evidence introduced at the hearing. The importance of that explanation cannot be overstated: meaningful review is simply not possible where the Superior Court fails to sufficiently explain its reasoning. *Mahabir v. Heirs of George*, 63 V.I. 651, 668-69 (V.I. 2015) ("[W]ithout some explanation . . . there is simply no way this Court can review the Superior Court's orders." (citing *Rennie v. Hess Oil V.I. Corp.*, 62 V.I. 529, 541 (V.I. 2015))); *James I*, 62 V.I. at 559 (" '[M]eaningful review [for an abuse of discretion] is not possible where the trial court fails to sufficiently explain its reasoning.' " (quoting *In re Q.G.*, 60 V.I. 654, 660 (V.I. 2014)) (collecting cases)). That importance is even more pronounced in a case such as this, where the mother disputes the legal sufficiency of the Superior Court's evaluation of the guardian *ad litem*'s recommendation, which itself was based on the effects of relocation to Florida on the child and the mother's status as primary caretaker.

The mother argues that the Superior Court erred by rejecting the recommendation of the guardian *ad litem*. That recommendation, although not binding on the Superior Court, is entitled to appropriate consideration. *James I*, 62 V.I. at 563 n.5. The Superior Court did provide some explanation for its departure from the guardian *ad litem*'s recommendation, stating in its conclusions of law,

> it is clear that the minor's residence, family composition, and extended family involvement has changed dramatically since the Home Study Report. The minor child is no longer receiving the benefit of the stability and familiarity of living in the same household.

It also observed, "[t]he difference between the recommendation . . . and the conclusions of this [c]ourt are not critical because the findings and recommendations of the guardian *ad litem* are only one factor that the [c]ourt considered." Neither this observation nor the court's partial explanation, how-

355

ever, complies with the second step of *Tutein*. The guardian *ad litem*'s recommendation was based on the impact on the child of relocation to Florida and the mother's status as primary caretaker. Although the record, and to a lesser extent, the Superior Court's findings of fact, reflect that the mother recently moved with the child, her fiancé, and their infant child from her former apartment below her parents' home on St. John to a caretaker's house also on St. John, it is clear that the Superior Court did not consider the impact of relocation to Florida on the child's best interests.[4] That impact, particularly where relied upon by the guardian *ad litem* in his custody recommendation, is a relevant factor that requires appropriate consideration in the evaluation of the recommendation itself. *See James I*, 62 V.I. at 563 n.5 ("[T]he guardian *ad litem*'s recommendation . . . must be given appropriate consideration as part of the two-step *Tutein* procedure."); *Jung v. Ruiz*, 59 V.I. 1050, 1061 (V.I. 2013) (noting that " 'the potential disruptive effects of the relocation itself and its potential benefits' " are relevant factors in weighing the best interests of the child (quoting PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.17 cmt. e (2002))). Since the Superior Court did not address the impact of relocation on the child, we are unable to meaningfully review its custody determination. *See James I*, 62 V.I. at 559 ("This lack of explanation makes it impossible for this Court to meaningfully review the Superior Court's determination." (citing *Tutein*, 60 V.I. at 721)).

Nor does it appear that the Superior Court properly considered the mother's status as primary caregiver. In *James I*, we held in part that the Superior Court abused its discretion by weighing the mother's role as primary caretaker in favor of the father. *Id.* at 561. Despite that holding, the Superior Court may have committed the same error in its July 22, 2015 custody order. In its accompanying findings of fact and conclusion of law, the Superior Court determined in relevant part:

### FINDINGS OF FACT

. . . .

32. *The minor has not been given the opportunity to have his father as his primary caretaker*, despite [the] Father's efforts since the child's birth.

---

[4] There is no dispute that the child continues to regularly visit his extended family and that the mother's work schedule has changed to more closely match his school schedule.

———

. . . .

36. Parenting the minor child on school nights during the school year and during the critical years of the child's life is of *utmost importance for the . . . Father.*

. . . .

## CONCLUSIONS OF LAW

10. Although recently the . . . Mother has been the primary caretaker . . . , this weight is mitigated by the fact the . . . Father has been diligent from the birth of his child in his efforts to be more of a parent to the minor, *but has never had the opportunity to have primary custody.*

. . . .

15. . . . Father's efforts since inception to get the child is indicative of his desire and ability. *The minor child should not be deprived of being raised by his father* just because his father has been unsuccessful in receiving a prior decision by the Court.

(Emphasis added.) Without any accompanying explanation, it is unclear whether the child being deprived of his father as primary caretaker violates our earlier instruction: the mother's role as the child's primary caretaker weighs in *her favor*, not the father's. *James I*, 62 V.I. at 560-61. It is also unclear whether the Superior Court's repeated references to the father's interests — "Parenting the minor child on school nights . . . is of utmost importance for the . . . Father" and "[the father] has never had the opportunity to have primary custody" — are relevant to the *child's* best interests or whether those references represent an improper attempt to subrogate the child's interests with those of the parent. *See James I*, 62 V.I. at 560 ("[T]here can be no doubt that [the Superior Court] 'lack[s] the discretion to subrogate the child's interests with those of the parents.' " (quoting *Jung*, 59 V.I. at 1068 (Cabret, J., dissenting))). Although we are able to infer, at least in part, that the father's interest in parenting his child could be attributable to either his ability to nurture the child or his disposition toward parenting, that inference still does not explain the relevance of his lack of "opportunity to have primary custody." As we explained in *James I*, the consideration of the father's "entitlement" to primary custody — whether phrased as a lack of "opportunity" or simply as an "entitlement" — is not relevant to the best interests of the child. *Id.* at 560 ("[T]he consideration in

357

this case of what the father is 'entitled' to with regard to the child fails this basic tenet of *Madir*." (citing *Madir*, 53 V.I. at 634)). Again, since the Superior Court failed to explain how these findings of fact and conclusions of law related to its outlined factors, we are not in a position to meaningfully review whether the Superior Court erred in its evaluation of the mother's role as primary caretaker and must remand for further proceedings. *See id.* at 559, 564; *cf. Rieara v. People*, 57 V.I. 659, 668 (V.I. 2012) (reversing and remanding for "the trial court to more thoroughly explain its reasons" for denying a reduction of bail).

We are now faced with deciding the shape those further proceedings will take. In a series of cases beginning with *Madir*, we have declined, in the absence of action by the Virgin Islands Legislature, to mandate factors for determining the best interests of the child. 53 V.I. at 634 n.7; *James I*, 62 V.I. at 560 n.2; *Tutein*, 60 V.I. at 721-22; *Jung*, 59 V.I. at 1057-58. Instead, we have simply instructed the Superior Court to apply and explain its own factors relevant to the best interests of the child. *See James I*, 62 V.I. at 559-60, 564. In the more than six years since *Madir* was decided, that instruction is still the only guidance provided to the Superior Court in conducting its custody evaluations. *See James I*, 62 V.I. at 560 n.2 (noting that "in the nearly five years since *Madir* was decided, the Legislature has provided no further guidance to the Superior Court on what to consider as part of the best-interests analysis in custody proceedings"). As this case demonstrates, such instruction has been inadequate to prevent unnecessary litigation that, by its very nature, harms the interests that it is intended to promote. *See* Steven N. Peskind, *Determining the Undeterminable: The Best Interest of the Child Standard as an Imperfect but Necessary Guidepost to Determine Child Custody*, 25 N. ILL. U. L. REV. 449, 473 (2005) ("One of the most detrimental results of custody litigation is the time it takes to adjudicate contested custody cases."); Janet Weinstein, *And Never the Twain Shall Meet: The Best Interests of Children and the Adversary System*, 52 U. MIAMI L. REV. 79, 124 (1997) ("Delays and uncertainty in the system are also difficult on children, creating anxiety and problems in developing secure relationships."). To reduce such harmful litigation, we believe that the time is ripe to formally adopt factors for determining the best interests of the child as a matter of common law. *See Stout v. Stout*, 1997 ND 61, 560 N.W.2d 903, 912 (1997) ("[W]e believe that the [best interests of the child] standard must be given more specific and instructive content in

order to provide our trial courts with adequate guidance and to provide more uniform dispute resolution.").

■ To adopt best-interests factors in the absence of binding authority, we must conduct the appropriate analysis. *See Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 981-84 (V.I. 2011). Pursuant to that analysis: we first examine which common law rule Virgin Islands courts have applied in the past; we next identify the majority rule adopted in other jurisdictions; and then finally — but most importantly — we determine which common law rule is soundest for the Virgin Islands. *Machado v. Yacht Haven U.S.V.I., LLC*, 61 V.I. 373, 380 (V.I. 2014) (collecting cases).

Courts in the Virgin Islands have historically considered a number of criteria in determining the best interests of the child. *See Hodge v. Hodge*, 13 V.I. 561, 573-80 (D.V.I. 1977) (considering parental misconduct, capacity for supervision and training, each parent's desire for custody, the child's preferences, and environment and surroundings); *Smith v. Cedano*, 24 V.I. 11, 14 (V.I. Super. Ct. 1988) (emphasizing that "the home environment offered by each parent" is an important consideration in determining which placement is in the best interests of the child (citing *Rogers v. Rogers*, 14 V.I. 130, 136, 138 (V.I. Super. Ct. 1977))); *Laurent v. Laurent*, 15 V.I. 409, 415 (V.I. Super. Ct. 1978) (considering "the . . . evidence of the parents' alleged . . . misconduct, [each parent's] capacity for supervision and training, their desire for custody, the preference of the children, and the environment and surroundings to which the children might reasonably be expected to be exposed by each parent"). This Court, in a series of cases, has acknowledged the appropriateness of a number of similar factors. In *Madir*, for example, we affirmed a custody decision where the Superior Court considered

> the respective home environments [of each parent], the ability of each parent to nurture the child, whether either parent was guilty of any abuse or neglect, the interrelationship of the child to the parents and other individuals who were present in the home, the ability of the child to interrelate to siblings, and the willingness of each parent to provide a stable home environment for the child.

53 V.I. at 632-34; *see also Tutein*, 60 V.I. at 721-22 (affirming a custody decision where the Superior Court applied the factors used in *Madir*). More recently, in *James I*, we explained that a parent's role as "primary caregiver

is a relevant and important consideration in a custody determination," 62 V.I. at 560-61, and that a guardian *ad litem*'s recommendation must be given appropriate consideration. *Id.* at 563 n.5.

 These factors are broadly supported in other jurisdictions. *See, e.g., Davidson v. Davidson*, 254 Neb. 357, 576 N.W.2d 779, 785 (1998) (noting that the trial court, in determining the best interests of the child, may consider in part, the respective home environments of each parent, the capacity of each parent to care for the child, the general health and welfare of the child, the interrelationship of the child to the parents, and the attitude and stability of each parent's character (citing *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204, 211-12 (1990))).[5] In light of such consistency between those factors considered historically in the Virgin Islands and those considered among the states, we conclude that the adoption of those factors previously recognized in *Madir, James I*, and in relevant part, *Smith, Laurent*, and *Hodge*, represents the soundest path

---

[5] The vast majority of states have codified factors relevant to the best interests of the child consistent with those identified in Virgin Islands case law. *See* ALA. CODE § 30-3-152(a), (c) (2016); ALASKA STAT. § 25.24.150(c) (2016); ARIZ. REV. STAT. ANN. § 25-403(A) (2016); CAL. FAM. CODE § 3011(a)-(d) (West 2016); COLO. REV. STAT. § 14-10-124(1.5)(a) (2016); CONN. GEN. STAT. § 46b-56(c) (2016); DEL. CODE ANN. tit. 13, § 722 (2016); D.C. CODE 16-914(a)(3) (2016); FLA. STAT. § 61.13(3) (2016); GA. CODE ANN. § 19-9-3(a)(3) (2016); HAW. REV. STAT. § 571-46(b) (2016); IDAHO CODE ANN. § 32-717(1) (2016); 750 ILL. COMP. STAT. 5/602.5(c) (2016); IND. CODE § 31-14-13-2 (2016); IOWA CODE § 598.41(3) (2016); KAN. STAT. ANN. § 23-3203(a) (West 2016); KY. REV. STAT. ANN. § 403.270(2) (West 2016); LA. CIV. CODE ANN. art. 134 (2016); ME. REV. ANN. STAT. tit. 18-A, § 5-101(1-A)(a) (2016); MICH. COMP. LAWS § 722.23 (2016); MINN. STAT. § 518.17(1)(a) (2016); MO. REV. STAT. § 452.375(2) (2016); MONT. CODE ANN. § 40-4-212 (2015); N.H. REV. STAT. ANN. § 461-A:6 (West 2016); N.M. STAT. ANN. § 40-4-9 (2016); N.D. CENT. CODE § 14-09-06.2 (2015); OHIO REV. CODE ANN. § 3109.04(F) (LexisNexis 2016); OR. REV. STAT. § 107.137 (2016); 23 PA. CONS. STAT. ANN. § 5328(a) (West 2016); TENN. CODE ANN. § 36-6-106(a) (2016); UTAH CODE ANN. § 30-3-10.2(2) (LexisNexis 2016); VT. STAT. ANN. tit. 15, § 665(b)-(c) (2016); VA. CODE ANN. § 20-124.3 (2016); WASH. REV. CODE § 26.09.002 (2016); W. VA. CODE § 48-9-102(a) (2016); WIS. STAT. § 767.41(5) (2016); WYO. STAT. ANN. § 20-2-201(a) (2016). This Court, however, limits its review of those authorities to those cases decided at common law before the enactment of child custody statutes, as well as to the common law in the remaining jurisdictions that have yet to adopt child custody statutes. *King v. Appleton*, 61 V.I. 339, 351 & n.9 (V.I. 2014). Upon review of those remaining authorities, it is clear that there is broad support for the best-interests factors identified in Virgin Islands case law. *See, e.g., Baber v. Baber*, 2011 Ark. 40, 378 S.W.3d 699, 705 (2011); *Boswell v. Boswell*, 352 Md. 204, 721 A.2d 662, 670 (1998); *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983); *Davidson*, 576 N.W.2d at 785; *Woodall v. Woodall*, 322 S.C. 7, 471 S.E.2d 154, 157 (1996); *Fuerstenberg v. Fuerstenberg*, 1999 SD 35, 591 N.W.2d 798, 807-10 (1999); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

forward because they prioritize the needs and welfare of the child and are also likely to produce results that achieve the greatest fairness between the parents. *See* 16 V.I.C. § 109(a)(1) (explaining that "[w]henever a marriage is declared void or dissolved the court may . . . [determine] the . . . custody of minor children . . . as it . . . deem[s] just and proper, . . . giving primary consideration to the needs and welfare of such children"); *Madir*, 53 V.I. at 632 ("[T]he primary considerations in awarding custody . . . are the needs and welfare of the child."); PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION § 2.02 cmt. b (explaining that "without confidence in the basic fairness of the rules, parents are more likely to engage in strategic, resentful or uncooperative behavior, from which children may suffer; conversely, when parents believe that the rules are fair, they are more likely to invest themselves in their children and act fairly toward others"). In conducting an evaluation of the best interests of a child, the Superior Court must consider, if relevant, at least the following factors:

(1) the respective home environments of each parent, including the degree to which relocation between those respective environments will impact the child's best interests, *Jung*, 59 V.I. at 1061-63; *see Madir*, 53 V.I. at 632, 634 (recognizing that "the respective home environments" is a relevant consideration in a custody determination); *see also Ritter*, 450 N.W.2d at 211-12 (same);

(2) the ability of each parent to nurture the child, including the degree to which each parent has acted as primary caretaker, *see James I*, 62 V.I. at 560-61; *Madir*, 53 V.I. at 632, 634; *see also Fuerstenberg*, 591 N.W.2d at 808 ("[The primary caretaker] factor is important . . . because it is a fair indicator of which parent has been more responsible to the child in the past."); Katharine T. Bartlett, *Child Custody in the 21st Century: How the American Law Institute Proposes to Achieve Predictability and Still Protect the Individual Child's Best Interests*, 35 WILLAMETTE L. REV. 467, 480 (1999) ("[P]ast caretaking patterns likely are a fairly reliable proxy of the intangible qualities such as parental abilities and emotional bonds that are so difficult for courts to ascertain.");

(3) any evidence of domestic violence, sexual violence, child abuse, or child neglect, *see* 16 V.I.C. § 109(b) ("[A] determi-

nation by the court that . . . domestic violence has occurred raises a rebuttable presumption that it is in the [child's] best interest[s] . . . to reside with the parent who is not the perpetrator."); *Madir*, 53 V.I. at 632, 634 (recognizing that "whether either parent was guilty of any abuse or neglect" is a relevant consideration in a custody determination); *Boswell*, 721 A.2d at 670 (noting that a child's best interests can be impacted "in situations involving sexual abuse, physical abuse, and/or emotional abuse by a parent");

(4) the interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect his or her best interests, *Madir*, 53 V.I. at 632, 634; *see also Baber*, 378 S.W.3d at 705 (noting that an important best-interests factor is the child's "relationship with siblings and other relatives" (citing *Hass v. Hass*, 80 Ark. App. 408, 97 S.W.3d 424, 426 (2003))); *Davidson*, 576 N.W.2d at 785 (noting that a court may consider "the effect on the child as the result of continuing or disrupting an existing relationship" (citing *Ritter*, 450 N.W.2d at 211)); and

(5) any recommendation by a court appointed guardian *ad litem*, *James I*, 62 V.I. at 563 n.5; *cf. Richelson v. Richelson*, 130 N.H. 137, 536 A.2d 176, 180 (1987) (emphasizing that guardians *ad litem* are important as advocates in custody determinations); *Short ex rel. Oosterhous v. Short*, 730 F. Supp. 1037, 1039 (D. Colo. 1990) (noting that "the need for an independent guardian *ad litem* is particularly compelling in custody disputes" because "parents are pitted against one another in an intensely personal and militant clash" and "children may be pawns in the conflict").

This list is by no means exhaustive, nor is each factor included on this list necessarily entitled to similar weight, for the Superior Court "must look to the unique family relationships of each case in order to reach a resolution that is in the best interests of the child[ ] in that particular family." *Pahl v. Pahl*, 2004 WY 40, 87 P.3d 1250, 1253 (2004); *see also Clark v. Div. of Family Servs.*, 975 A.2d 813, 822 (Del. 2009) (noting that "[i]t is well-established that the [trial court] may assign different weights to the various best interests factors, and that in some cases one factor may counterbalance

362

or even outweigh the rest" (citing *Fisher v. Fisher*, 691 A.2d 619, 623 (Del. 1997))). To the extent that the Superior Court considers other additional factors, such factors must be relevant to the child's best interests. *James I*, 62 V.I. at 560 (citing *Madir*, 53 V.I. at 634). But, regardless of whether the court's decision relies solely on the factors identified above or whether it also incorporates additional relevant factors, that decision must comply with the procedure outlined in *Tutein*: first, it must outline the factors it will use to determine the best interests of the child, and second, it must explain how its findings of fact regarding those factors are supported by the evidence. 60 V.I. at 721; *cf. In re Wilson*, 162 Vt. 281, 648 A.2d 648, 651 (1994) ("In weighing these or other factors, what is important is that the court *explain* its reason[ing]." (emphasis added) (citing *Corrette v. Town of St. Johnsbury*, 140 Vt. 315, 437 A.2d 1112, 1113 (1981))).

Accordingly, because the Superior Court did not adhere to this Court's remand instruction directing it to follow the two-step *Tutein* procedure, we vacate and remand for the Superior Court to conduct further proceedings consistent with this opinion.

## IV. CONCLUSION

The Superior Court erred in its custody determination because it failed to comply with the second step of the *Tutein* procedure, which requires the court to "explain how its findings of fact regarding [its best-interests] factors are supported by the evidence introduced at the hearing." 60 V.I. at 721. Therefore, we vacate the Superior Court's July 22, 2015 custody order and remand for further proceedings.